**ACORN and Liz Wolff, Plaintiffs-Appellants,**

v.

**CITY OF PHOENIX and the Chief of Police of the City of Phoenix, Defendants-Appellees.**

**C.A. No. 85–1810.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1986.

Decided Sept. 2, 1986.

Steve Bachmann, Brooklyn, N.Y., for plaintiffs-appellants.

Michael House, Richard J. Graci, Phoenix, Ariz., for defendants-appellees.

Before JAMES R. BROWNING, Chief Judge, and TANG and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

ACORN, a political action organization, and its local leader, Liz Wolff, appeal the district court's holding that the City of Phoenix acted constitutionally in preventing organization members from accosting the drivers and passengers of automobiles temporarily stopped at red traffic lights at city street intersections to solicit contributions to its cause. ACORN contends a Phoenix ordinance prohibiting solicitation

on city streets from the occupants of vehicles infringes its members' rights of free speech under the First Amendment.

The district court held that Phoenix city streets were not public fora uniquely suited for the exercise of free speech, and that the Phoenix ordinance was a reasonable regulation to promote public peace, health, and safety. We affirm on other grounds.

## I

## BACKGROUND

The Association of Community Organizations for Reform Now (ACORN) is a nonprofit political action organization working to promote the concerns of low and moderate income citizens. ACORN members in Phoenix, Arizona, headed by their local leader, Liz Wolff, have previously raised funds for their cause through the practice of "tagging."

"Tagging" usually involves an individual stepping into the street and approaching an automobile when it is stopped at a red traffic light. The individual asks the occupants of the vehicle for a contribution to ACORN and distributes a slip of paper, or "tag," providing information about ACORN and its activities.

On at least two occasions, Phoenix officials or police officers warned ACORN representatives that this conduct was unlawful, and that ACORN members engaging in solicitation from the occupants of vehicles would be subject to citation. ACORN members apparently were informed by the city that such citations would be issued for violations of Arizona Revised Statute § 28–796, which prohibits pedestrians from walking "along and upon" a roadway adjacent to a sidewalk and from standing in a roadway "for the purpose of soliciting a ride from the driver of any vehicle."

On May 12, 1983, ACORN and Liz Wolff instituted an action in federal district court against the City of Phoenix, the Phoenix Chief of Police, and the Attorney General

of Arizona[1] under 42 U.S.C. § 1983. ACORN contended that the practice of soliciting contributions from occupants of vehicles was protected under the First and Fourteenth Amendments of the Constitution. ACORN sought a declaratory judgment that Arizona Revised Statute § 28–796 was either inapplicable to "tagging" or was unconstitutional; an injunction against any law enforcement action interfering with its First Amendment activities; an award of $5,000 in damages to each plaintiff; attorney's fees under 42 U.S.C. § 1988; and a preliminary injunction.

On June 13, 1983, the district court denied ACORN's motion for preliminary injunction. On March 12, 1984, the district court denied ACORN's motion for summary judgment and Phoenix' motion to dismiss the complaint. In denying the motions, the district judge expressed concern that Arizona Revised Statute § 28–796, as well as other traffic statutes and ordinances relied upon by Phoenix, might not apply to solicitation from occupants of motor vehicles. The judge suggested that "the City could enact an ordinance ... that would tell people you can't carry on solicitation or commercial activities or otherwise, in an intersection or in an area adjacent to an intersection."

Apparently in response to the judge's comments, on May 9, 1984, Phoenix adopted the following ordinance: "No person shall stand on a street or highway and solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle." Phoenix City Ordinance § 36–101.01.

After passage of this ordinance, both parties stipulated in a pretrial order that the resolution of ACORN's action depended upon a determination of the constitutionality of the ordinance.

Following a one-day bench trial on February 5, 1985, the district court entered judgment in favor of Phoenix on February

---

1. Prior to trial, the district court granted the Attorney General's motion to dismiss the action as to him. As the action had become focused upon the subsequently adopted Phoenix ordinance, ACORN raised no objection to this motion.

19, 1985, ruling that the new ordinance was constitutional as applied to ACORN. *ACORN v. City of Phoenix*, 603 F.Supp. 869 (D.Ariz.1985). The judgment accompanying the published opinion ordered the action dismissed. ACORN timely appealed.

## II

## STANDARD OF REVIEW AND JURISDICTION

### A. Standard of Review

■ The question as to whether ACORN's First Amendment free speech rights have been infringed is a mixed question of law and fact "since it requires us to apply principles of First Amendment jurisprudence to the specific facts of this case." *See Fraser v. Bethel School Dist. No. 403*, 755 F.2d 1356, 1359 n. 2 (9th Cir.1985), *rev'd on other grounds*, —— U.S. ——, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). The appropriate standard of review is de novo because the application of constitutional law to the facts of this case "requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles." *See United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *see also Jews for Jesus, Inc. v. Board of Airport Commissioners*, 785 F.2d 791, 792 (9th Cir.1986).

■ In a First Amendment case, the party imposing a prior restraint upon protected expression carries a heavy burden to justify that action. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577–78, 29 L.Ed.2d 1 (1971).

We may affirm the district court on any ground fairly supported by the record. *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1288 (9th Cir.1985).

### B. Presentation of Challenge to Phoenix Ordinance

■ Although ACORN's pleadings challenge only the validity of Arizona Revised Statute § 28–796, rather than the subsequently enacted Phoenix ordinance banning solicitation from occupants of vehicles, we conclude that ACORN properly presented the question of the validity of the Phoenix ordinance to the district court.

Both ACORN and Phoenix stipulated in the pretrial order that the resolution of ACORN's action depended upon a determination of the validity of the new Phoenix ordinance. A pretrial order has the effect of amending the pleadings. *999 v. C.I.T. Corp.*, 776 F.2d 866, 870 n. 2 (9th Cir.1985); *Federal Deposit Insurance Corp. v. Glickman*, 450 F.2d 416, 419 (9th Cir.1971).

Accordingly, the question of the validity of this Phoenix ordinance is properly before us on this appeal.

### C. Standing to Challenge Phoenix Ordinance

■ ACORN has demonstrated a sufficient stake in the outcome of this litigation to establish jurisdictional standing to raise its free speech concerns under the First Amendment. There are two components to the standing doctrine.

### 1. Injury in Fact

First, the plaintiff must allege an "injury in fact" sufficient to show a "personal stake" in the outcome of the legal action. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Radio and Television News Association v. United States District Court*, 781 F.2d 1443, 1445 (9th Cir.1986).

ACORN in its complaint had alleged that Phoenix law enforcement officials would prevent them from pursuing "tagging" solicitation directed at occupants of vehicles. More importantly, in the pretrial order amending the pleadings, the parties stipulated that the Phoenix Chief of Police would continue to enforce city ordinances, which would include the particular ordinance at issue in this case. The pretrial order also states that the plaintiffs alleged they were "afraid to pursue tagging activities in Phoenix, given defendants' anti-tagging ordinance." ACORN has engaged in solicitation from occupants of vehicles in the past, and there is no reason to doubt the earnest desire of its members to resume such activities.

ACORN has thus alleged "both threatened and actual injury" as a result of the ordinance. *See Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 954–55, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984). We do not insist that an individual break the law in order to the test the constitutionality of an ordinance, as this would "risk punishing him for conduct which he may have honestly thought was constitutionally protected." *International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir.1979). As ACORN alleges the challenged ordinance deters them from soliciting contributions from occupants of vehicles, the alleged "injury to their first amendment rights recurs each day and is, in a sense, irreparable." *Id.*

### 2. Zone of Interests

Second, to establish standing, a plaintiff must show that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Although we conclude otherwise on the merits, it is plain that ACORN asserts an interest that is at least "arguably" protected by the First Amendment. *See Radio and Television News Association*, 781 F.2d at 1446.

ACORN has standing on behalf of its members, and Liz Wolff has standing in her own right, to seek declaratory and injunctive relief, as well as constitutional damages, based upon a challenge to the Phoenix ordinance.

### III

### NATURE OF THE FORUM: PUBLIC OR NON-PUBLIC

### A. Forum Analysis

■ The degree of protection afforded to an interest within the scope of the First Amendment depends in substantial part upon the forum in which the activity is pursued. *Jews for Jesus, Inc.*, 785 F.2d at 793. The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, — U.S. —, —, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985).

■ Public fora generally are those "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Certain public locales, such as sidewalks, streets, and parks have been recognized as traditional public fora, which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939); *see also Perry Education Association*, 460 U.S. at 45, 103 S.Ct. at 955.

A second category of public fora consists of "public property which the State has opened for use by the public as a place for expressive activity." [2] *Perry Education Association*, 460 U.S. at 45, 103 S.Ct. at 955. This type of public forum has been called a "limited public forum" or a "public forum by designation." *San Diego Committee Against Registration and the Draft (CARD) v. Governing Board of Grossmont Union High School District*, 790 F.2d 1471, 1475 (9th Cir.1986). "A limited public forum may, depending upon

---

**2.** *See, e.g., Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (university meeting facilities); *City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theatre).

its nature and the nature of the state's actions, be open to the general public for the discussion of all topics, or there may be limitations on the groups allowed to use the forums or the topics that can be discussed." *Id.* Otherwise, the same standards apply as with a traditional public forum. *Perry Educational Association,* 460 U.S. at 45, 103 S.Ct. at 955.

In public fora, "the government's ability to permissibly restrict expressive activity is very limited." *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). Public fora "represent areas within which tolerance for inhibitions on speech, petition, and assembly is at a minimum, and government's burden of justification at its highest." L. Tribe, *American Constitutional Law* § 12-20, at 684 (1978). Speakers may be excluded from a public forum only when "the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius,* —— U.S. at ——, 105 S.Ct. at 3448; *see also Grace,* 461 U.S. at 177, 103 S.Ct. at 1707. In addition, the government may enforce reasonable time, place, and manner regulations provided the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Education Association,* 460 U.S. at 45, 103 S.Ct. at 955; *see also Grace,* 461 U.S. at 177, 103 S.Ct. at 1707.

▇ When public property is not characterized as a public forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education As-*

sociation,* 460 U.S. at 46, 103 S.Ct. at 955. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966); *see also Perry Education Association,* 460 U.S. at 46, 103 S.Ct. at 955. Indeed, a complete ban on free expression may be imposed in a nonpublic forum if the prohibition is reasonable and content-neutral. *See United States Postal Service v. Council of Greenburgh Civil Associations,* 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981).

## B. Character of Streets While Open to Motorized Vehicles

ACORN contends that its practice of soliciting contributions from occupants of vehicles momentarily stopped at traffic lights is First Amendment activity occuring within a "traditional public forum."[3] ACORN's authority for this proposition lies in the Supreme Court's frequent reference to "streets" as an example of those public locales historically reserved for public expression. *See, e.g., Cornelius,* —— U.S. at ——, 105 S.Ct. at 3449; *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 814, 104 S.Ct. 2118, 2134, 80 L.Ed.2d 772 (1984); *Grace,* 461 U.S. at 177, 103 S.Ct. at 1707; *Perry Education Association,* 460 U.S. at 45, 103 S.Ct. at 955. This long-standing designation of "streets" as traditional public fora was first enunciated in this oft-quoted passage from *Hague v. C.I.O.,* 307 U.S. 496, 515-16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939):

> Wherever the title of streets and parks may rest, they have immemorially been

---

**3.** ACORN initially argued as well that, even if Phoenix streets are not regarded as traditional public fora by having been historically reserved for public expression, Phoenix had expressly made the streets available as limited public fora by granting other parties access to the streets to solicit from the occupants of vehicles. ACORN has since conceded that this argument was based upon a misunderstanding of the trial record. Even if the City of Phoenix at one time

had opened the streets as a public forum by express designation, the government "is not required to indefinitely retain the open character of the facility." *See Perry Education Ass'n,* 460 U.S. at 46, 103 S.Ct. at 955. The ordinance at issue clearly closed the forum to ACORN's intended use. The only remaining issue is whether the streets constitute a traditional public fora, particularly suited for public expression, which cannot be closed to First Amendment activities.

held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

Based upon this authority, a federal district court sitting in Louisiana held that the streets of New Orleans were public fora, and that ACORN in that city had a constitutionally protected right to solicit contributions from the occupants of vehicles and from pedestrians along the roadway. *ACORN v. City of New Orleans*, 606 F.Supp. 16, 19–20 (E.D.La.1984).

In the instant case, the district court dismissed the Supreme Court's designation of streets as public fora by saying that the "cases cited above by ACORN refer to 'streets' as public forums, typically in the context of sidewalks and other locales traditionally reserved for public communication." [4] *ACORN v. City of Phoenix*, 603 F.Supp. 869, 870 (D.Ariz.1985). This narrow interpretation of the relevant Supreme Court precedent cannot be sustained.

In decisions where the Court has designated "streets" as traditional public fora, there is no reason to believe the Court was using the word in any way other than its commonly accepted meaning. Indeed, the Court has listed "sidewalks" separately as an additional example of traditional public fora, rather than as wrapped up in a broad definition of the word "streets." *See, e.g., Grace*, 461 U.S. at 177, 103 S.Ct. at 1707 (public fora include "streets, sidewalks, and parks"); *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 315, 88 S.Ct. 1601, 1607, 20 L.Ed.2d 603 (public fora include "streets, sidewalks, parks, and other similar public places"). Furthermore, in this circuit, we have expressly characterized public streets as "the prototypal example of a public forum" when a party sought access to the streets themselves for a parade. *NAACP, Western Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984); *see also Shuttlesworth v. Birmingham*, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969).

 However, this is not necessarily the end of the inquiry. To conclude that streets may generally be categorized as traditional public fora may not require us to also conclude that the streets at all times and under all circumstances are susceptible to characterization as a perpetual public forum uniquely available for free expression. The district court ruled, "Clearly, 'by long tradition or government fiat' such areas [streets] are not designated as forums for public communication *while in use by*

---

**4.** ACORN also argues that the district court's decision holding that the plaintiffs' activities did not take place within a public forum was based, at least in part, upon the district court's mistaken impression that ACORN's solicitation activity occurred within the actual intersection of the street in the path of moving vehicles. Instead, the testimony was that its "tagging" activity was performed along the line of cars stopped for the traffic light, but not in the actual intersection.

This argument may reflect a mistaken reading of the district court's opinion. The court's frequent use of the term "intersection" need not be

read as a finding that "tagging" occurred in a manner so as to obstruct the actual intersection. Rather the term can be viewed as merely describing that particular area of the street, adjacent to the intersection, where the activity occurred.

To the extent the district court viewed the solicitation as occurring *within* the intersection, the court's understanding of the factual record was in error. However, we may affirm upon any basis fairly supported by the record. *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1288 (9th Cir.1985).

*vehicular traffic."* 603 F.Supp. at 871 (emphasis added).[5]

As a practical matter, there are indeed substantial differences in nature between a street, kept open to motorized vehicle traffic, and a sidewalk or public park. A pedestrian ordinarily has an entitlement to be present upon the sidewalk or on the grounds of a park and thus is generally free at all times to engage in expression and public discourse at such locations. This is obviously not true of streets continually filled with pulsing vehicle traffic. Consequently, more so than with sidewalks or parks, courts have recognized a greater governmental interest in regulating the use of city streets. *Cf. NAACP, Western Region,* 743 F.2d at 1355. For example, cities may constitutionally prohibit parades or demonstrations upon any public streets without a special permit from city authorities, *Cox v. New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941), although a city may not unreasonably withhold such a permit or require undue advance notice to obtain a permit, *NAACP, Western Region,* 743 F.2d at 1357.

However, under the circumstances of this case, we need not decide whether public streets are perpetual public fora. Consequently, we intimate no views on the validity of the novel argument that streets are not public fora while simultaneously in use by motor vehicles. We conclude that the Phoenix ordinance can be justified even under the more rigorous standards applied to the regulation of expression in traditional public fora. We assume for the purposes of this case that the Phoenix ordinance applies to activities occurring within a public forum.

IV

## THE PHOENIX ORDINANCE AS TIME, PLACE, AND MANNER REGULATION

█ The Phoenix ordinance does not ban solicitation of contributions altogether, but rather regulates the locale and permissible targets for such activity. Moreover, it imposes no restrictions on other forms of communication, such as oral advocacy or distribution of literature, even to occupants of vehicles. Thus, the ordinance is properly analyzed as a form of time, place, and manner regulation. *See Renton v. Playtime Theatres, Inc.,* — U.S. —, —, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). Where a public forum is involved, a regulation must be "content-neutral," "narrowly tailored to serve a significant government interest," and "must leave open ample alternative channels of communication." *Perry Education Association,* 460 U.S. at 45, 103 S.Ct. at 955.

On its face, the Phoenix ordinance does not single out any group or the content of any speech. The ordinance applies even-handedly to every organization or individual, regardless of viewpoint, which would desire to solicit contributions, business, or employment from the occupants of vehicles traveling on Phoenix streets. *See Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 648–49, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). Any argument that this ordinance was passed to suppress the particular political views expressed by ACORN is contradicted by the parties' own stipulation in the pretrial order that the ordinance was adopted

---

**5.** It cannot be disputed that streets are public fora in the sense that they must be made available for public expression in the traditional form of parades and demonstrations. Cities may exercise a great deal of control over the use of public streets in the interest of traffic regulation and safety, but those interests must give way on occasion to the temporary dedication of the streets to picketing and parading. *See Shuttlesworth v. Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969). The argument raised here, instead, is that streets are not

public fora in the same immutable and perpetual sense as sidewalks and public parks, which are uniquely suitable for public gatherings and the expression of political or social opinion. In this case, the district court apparently reasoned that when streets are not specifically reserved for free speech, through a parade or demonstration permit, they do not constitute public fora. At such times, the court concluded, the streets may properly be reserved for the general purpose of public transportation.

to promote the city's interest in "public peace, health and safety." The ordinance thus is "content-neutral."

The Supreme Court has indicated that a regulation of a First Amendment interest is "reasonable" when it is designed to serve a "substantial governmental interest" and does not "unreasonably limit alternative avenues of communication." *See Renton v. Playtime Theatres, Inc.*, — U.S. at —, 106 S.Ct. at 928.

Although ACORN limits its challenge of the ordinance to the question of whether the regulation is necessary to maintain public safety, it is apparent from the stipulation in the pretrial order that Phoenix was also concerned about disruptions in the flow of traffic and the harassment of the occupants of vehicles. We shall address each of these concerns in turn.

### V

### TRAFFIC FLOW AND SAFETY CONCERNS

#### A. Disruption of Orderly Flow of Traffic

The orderly flow of motorized traffic is a major concern in congested urban areas, particularly because an obstruction or delay in traffic at one point along a traffic artery results in delays and backups far back down the roadway.

The courts have recognized the substantial risk of disruption in crowd or traffic control that may be presented by solicitation of contributions, as compared to other forms of expression. In *Heffron v. International Society for Krishna Conscious-*

*ness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the Supreme Court upheld a state fair rule restricting solicitation of contributions and distribution of literature to stationary booths, although permitting individuals to wander through the fairgrounds to express ideas to the crowds. The Court found significant that members of organizations were free to "orally propagate their views" throughout the fairgrounds, and that only solicitation, sales, and distribution were restricted. *Id.* at 655, 101 S.Ct. at 2567. The Court thereby recognized a distinction between the purely communicative aspect of oral advocacy on the one hand, and the solicitation of contributions on the other hand, which can prove more disruptive of order and crowd flow. This is because solicitation and selling require "stopping [individuals] momentarily or for longer periods as money is given or exchanged for literature." *Id.* at 653, 101 S.Ct. at 2567.[6]

Likewise, restrictions on solicitation are particularly appropriate in the context of assuring the free movement of vehicle traffic on city streets. The Phoenix ordinance is aimed narrowly at the disruptive nature of fund solicitation from the occupants of vehicles. Direct communication of ideas, including the distribution of literature to occupants in vehicles, is not restricted.

Although appeals for funds are indeed protected under the First Amendment as speech-related conduct, *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73 (1980), solicitation

---

6. Justice Blackmun, in a partial concurrence and dissent, was even more explicit in his observations of the particularly disruptive character of solicitation. Although Justice Blackmun agreed that solicitation could be confined to a fixed booth at the fair, he thought the rule was unconstitutional as applied to the distribution of literature:

... I think that common-sense differences between literature distribution, on the one hand, and solicitation and sales, on the other, suggest that the latter activities present greater crowd control problems than the former. The distribution of literature does not require that the recipient stop in order to receive the

message the speaker wishes to convey; instead, the recipient is free to read the message at a later time.... [S]ales and the collection of solicited funds not only require the fairgoer to stop, but also "engender additional confusion ... because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc." *Heffron*, 452 U.S. at 665, 101 S.Ct. at 2573 (Blackmun, J., concurring and dissenting) (quoting *International Society for Krishna Consciousness, Inc. v. Heffron*, 299 N.W.2d 79, 87 (Minn.1980)). *See also International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 828–29 (5th Cir.1979).

goes beyond pure speech in the response it demands on the part of the audience. Unlike oral advocacy of ideas, or even the distribution of literature, successful solicitation requires the individual to respond by searching for currency and passing it along to the solicitor. Even after the solicitor has departed, the driver must secure any change returned, replace a wallet or close a purse, and then return proper attention to the full responsibilities of a motor vehicle driver. The direct personal solicitation from drivers distracts them from their primary duty to watch the traffic and potential hazards in the road, observe all traffic control signals or warnings, and prepare to move through the intersection.

## B. Traffic Safety Concerns

The distraction of motorists occasioned by solicitation not only threatens to impede the orderly flow of traffic, but also raises serious concerns of traffic and public safety. As the Seventh Circuit noted when considering a similar provision prohibiting solicitation from the occupants of vehicles, we can certainly recognize the " 'evident dangers of physical injury and traffic disruption that are present when individuals stand in the center of busy streets trying to engage drivers and solicit contributions from them.' " *United States Labor Party v. Oremus*, 619 F.2d 683, 688 (7th Cir.1980) (quoting its earlier unpublished decision).[7] The Phoenix ordinance appears to be a narrowly drawn regulation to address these safety concerns.[8]

ACORN makes much of certain evidence presented at trial that purportedly demonstrates the existence of 36 to 100 locations in Phoenix where solicitation from vehicles could occur without endangering traffic safety. ACORN claims that Phoenix failed to contradict that evidence with regard to at least some 36 of the sites.[9] This is not altogether true.

7. In *United States Labor Party v. Oremus*, the Seventh Circuit considered the constitutional validity of a state statute which prohibited standing on a highway to solicit contributions from the occupants of vehicles. ACORN contends this decision is distinguishable from the instant case in that the statute in the *Labor Party* case regulated solicitation on *highways*, where safety concerns are assertedly much greater than they are with regard to city streets. The Seventh Circuit's decision should not be read so narrowly.

Although the statute in the *Labor Party* referred to standing on "a highway," the activity at issue in the case was solicitation directed at "persons in vehicles stopped momentarily at the intersection of 79th and Harlem" in a small municipality. 619 F.2d at 686. The court's concern was with the practice of "soliciting in traffic," *id.* at 688, not with whether the activity occurred on a "highway" as opposed to a "street." Indeed, the court used the terms "street" and "highway" interchangeably. The Seventh Circuit concluded that the purpose of keeping "streets open and safe for travel" was sufficient to sustain the regulation against a First Amendment challenge. *Id.*

8. ACORN also argues that Phoenix improperly singled out solicitation from vehicles for regulation, while ignoring such other potential distractions to motorists as billboards adjacent to the roadway or what ACORN calls "human pulchritrude [sic]", better described as attractive pedestrians walking along the street.

This argument is without merit. The degree of distraction entailed by ACORN's "tagging" practices is plainly far greater. It is much easier to ignore a billboard or pedestrian along the roadway than an individual standing closely beside your car, peering in the window directly at you, and demanding a personal response from you.

9. These 36 sites identified by ACORN involve one-way streets, where solicitors standing on the sidewalk could solicit from vehicles in the far left lane. As the ordinance prohibits solicitation from occupants of vehicles when the solicitor "stand[s] on a street or highway," it might be argued that solicitation from vehicles while standing on the sidewalk is not prohibited by the ordinance.

However, neither party has read the ordinance so narrowly, and the district court assumed that such conduct would also be proscribed. Indeed, the ordinance by prohibiting solicitation while *"on"* the street, as opposed to *"in"* the street, may be read to refer more generally to solicitation occuring in direct proximity to the street. This would be consistent with the apparent thrust of the ordinance, which is to identify the prohibited target of such solicitation—the occupants of vehicles—rather than the location where such conduct occurs.

At any rate, as discussed later in this opinion, ACORN has not preserved the issue of "vagueness" or lack of precision in the language of the ordinance. For purposes of this appeal, we assume that the ordinance prohibits all solicitation from the occupants of vehicles by persons standing in or along the street or highway.

The expert witness presented at trial by Phoenix did not directly dispute all of ACORN's particularized evidence concerning certain specific intersections in Phoenix. However, the Phoenix expert did testify that solicitation from motorists creates a potential safety hazard because the consequent distraction of the drivers poses a significant risk to motorist and pedestrian safety. Distracted drivers are more prone to automobile accidents, and evidence was presented that accidents at intersections constitute a substantial traffic safety problem in Phoenix. The introduction of yet another distraction into the traffic system could serve only to exacerbate that problem.

Even in those supposedly "safe" locations, ACORN concedes that solicitation from vehicles can be conducted safely only with the imposition of seven conditions, which Phoenix contends fail to account for all potential safety hazards raised by solicitation of motorists.[10] As the district court concluded, "Even requiring the seven conditions suggested by ACORN to minimize the potential safety problems would be an inadequate solution. The evidence still showed that the mere presence of taggers on the roadway or intersection is a potential safety hazard." 603 F.Supp. at 871.

Furthermore, the validity of the Phoenix ordinance need not be judged solely by reference to ACORN's desire to engage in such solicitation activities. *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 296–97, 104 S.Ct. 3065, 3070–71, 82 L.Ed.2d 221 (1984). Even if occasional solicitation of motorists by one group could be controlled with a maximum effort on the city's part, Phoenix may appropriately consider the cumulative impact if many other organizations likewise decided to engage in this activity on a pervasive or regular basis. *See Heffron,* 452 U.S. at 652–54, 101 S.Ct. at 2566–67. The multiplied effect of such activity could result in "widespread disorder" in the Phoenix roadway. *See id.* at 653, 101 S.Ct. at 2567.

ACORN still argues that Phoenix could have equally served its interests through a less restrictive means by prohibiting only solicitation that disrupted traffic. The record contains support for the district court's factual finding that "[t]he evidence still showed that the mere presence of taggers on the roadway or intersection is a potential safety hazard." 603 F.Supp. at 871. On the basis of this factual finding, we conclude the Phoenix ordinance is narrowly tailored to address legitimate traffic safety concerns. *See United States Labor Party v. Oremus,* 619 F.2d at 688 & n. 4.[11]

10. An expert witness presented by ACORN at trial suggested seven conditions to minimize safety problems posed by solicitation from occupants in vehicles: (1) require solicitors to wear high visibility clothing; (2) impose a limit on the number of solicitors working at an intersection; (3) limit solicitation to "the left side of one-way streets, where there is no curbed parking" and "on the median side of streets that have barrier type medians, with raised curbing on the approach to signal lighted intersections" where the median is at least six-feet wide; (4) require solicitors to return to a neutral area when the traffic signal changes to yellow for cross traffic; (5) require soliciting organizations to post a supervisor with a whistle at each intersection to monitor the traffic light; (6) limit solicitation to daylight hours; and (7) prohibit solicitors from going into the street between cars that are backed up.

Phoenix, through cross-examination and its own expert witness, contended these seven conditions were inadequate as they failed to account for (1) the fact that vehicles generally come to a rolling stop at intersections and thus are often still moving; (2) landscaping on medians where solicitors stand may obscure the solicitor so that vehicles slowing down to queue up at the traffic light might not see the solicitor until he steps out into the lane of traffic; (3) the problems raised by one-way streets with left turns possible onto another one-way street; (4) the existence of complex multiple leg intersections; (5) the potential problem where more than one organization desires to solicit from motorists at the same location; (6) concerns as to the appropriate minimum age for solicitors; (7) the fact that vehicles frequently strike the median in Phoenix, which is where solicitors would stand; and (8) the safety hazard to solicitors when vehicles run red lights. Most importantly, ACORN's seven conditions fail to account for the fact that the distraction posed to motorists in and of itself threatens traffic safety.

11. Phoenix argues its ordinance also promotes "public peace" by protecting motorists in Phoenix from harassment by solicitors when temporarily confined to their vehicles as they wait for the traffic light to change.

## VI

### ALTERNATIVE AVENUES FOR COMMUNICATION

A reasonable regulation of First Amendment activity within a public forum "must leave open ample alternative channels of communication." *Perry Education Association*, 460 U.S. at 45, 103 S.Ct. at 955. ACORN contends the Phoenix ordinance must fall because solicitation from the occupants of vehicles is a uniquely effective method of fundraising for the organization, for which no significant alternative approach exists.[12]

Furthermore, with the myriad and diverse methods of fundraising available in this country, including solicitation on the sidewalk from pedestrians, canvassing door-to-door, telephone campaigns, or direct mail, it strains credulity to believe that ACORN is left without ample alternatives by the mere foreclosure of one questionable approach to soliciting contributions.

Indeed, we note that ACORN is not precluded under the ordinance from distributing literature, even to occupants of vehicles.[13] In *National Anti-Drug Coali-*

tion, Inc. v. Bolger, 737 F.2d 717, 726–27 (7th Cir.1984), the Seventh Circuit upheld a regulation which prohibited the solicitation and sale of literature on postal service property as disruptive to postal business, but which permitted the distribution of free literature. That court noted:

> We add that the distributed literature could adequately explain the organization, how to obtain a membership, and where to send any contribution. In this way, the organization could convey its message without disrup[tion] ... and the recipient would be free to read the message at a later time.

*Id.* at 728; *see also Glover v. Cole*, 762 F.2d 1197, 1203 (4th Cir.1985).

That same alternative avenue of communication is available to ACORN under the provisions of the Phoenix ordinance.

## VII

### OVERBREADTH AND VAGUENESS CHALLENGES

ACORN has also challenged the Phoenix ordinance as overbroad and unconstitution-

---

Communicative activities are entitled to less protection under the First Amendment when directed toward a "captive audience." *See generally Nimmer on Freedom of Speech* § 1.02[F][2] (1984); Comment, *"I'll Defend to the Death Your Right to Say It ... But Not to Me"—The Captive Audience Corollary to the First Amendment*, 1983 S. Ill. U. L.J. 211. Under circumstances where the unwilling target of a communication is physically confined or as a practical matter unable to avoid a message without suffering an inconvenience, the problem of the "captive audience" is presented. Comment, *supra*, 1983 S. Ill. U. L.J. at 211–12. The Supreme Court has held that "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." *Rowan v. United States Post Office Department*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970); *see also Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974); *Public Utilities Commission v. Pollak*, 343 U.S. 451, 467–69, 72 S.Ct. 813, 823–24, 96 L.Ed. 1068 (1952) (Douglas, J., dissenting).

As the Phoenix ordinance is amply justified by traffic flow and safety concerns, we need not decide whether the "captive audience" corollary to the First Amendment would apply in the context of personal solicitation of drivers and passengers in vehicles temporarily halted at street intersections.

12. In a sense, this argument proves too much. Undoubtedly the secret of ACORN's unique success is that its solicitation scheme is directed at an audience temporarily trapped in their vehicles. Such a confined, unwilling audience is more susceptible to undue pressure. ACORN has no constitutionally protected right to maintain that approach to funding its organization.

13. It could be argued that much of the analysis presented in this opinion concerning solicitation from occupants of vehicles would apply as well to the distribution of literature or even oral advocacy directed to motorists. On the other hand, solicitation can be distinguished as a particularly intrusive and disruptive form of communication. *See National Anti-Drug Coalition, Inc. v. Bolger*, 737 F.2d 717, 727 (7th Cir.1984) ("solicitation of this type, by its very nature, is inherently more assertive and aggressive than other forms of speech."). We simply note that the Phoenix ordinance does not regulate forms of communication other than solicitation. We need not address the degree of constitutional protection that would be afforded to other types of expression under similar circumstances.

ally vague. The district court granted Phoenix' motion to strike these arguments as untimely made and contrary to the pretrial order under Federal Rule of Civil Procedure 16(e).

A pretrial order under Rule 16(e) "controls the subsequent course of action in the litigation unless it is modified by a subsequent order." *Eagle v. American Telephone and Telegraph Co.*, 769 F.2d 541, 548 (9th Cir.1985). The order was never modified; ACORN never requested any modification.

However, a pretrial order will be liberally construed to permit consideration of any issues that are " 'embraced within its language.' " *Miller v. Safeco Title Insurance Co.*, 758 F.2d 364, 368 (9th Cir.1985) (quoting *United States v. First National Bank of Circle*, 652 F.2d 882, 886–87 (9th Cir. 1981)). We review the district court's decision to exclude issues as contrary to the pretrial order for a clear abuse of discretion. *Id.* at 369; *see Eagle*, 769 F.2d at 548.

■ The pretrial order contains no reference to "vagueness." The district court's finding that the pretrial order does not even implicitly include a vagueness argument does not appear to be a clear error of judgment. Accordingly, the district court did not abuse its discretion by refusing to consider the untimely vagueness argument.

■ The question of whether ACORN timely raised the issue of "overbreadth" in challenging the ordinance is more difficult. The pretrial order does include the following as an issue of law to be determined at trial:

> Plaintiffs contend: Defendants' anti-tagging ordinance is an unconstitutional regulation of First Amendment activity because it regulates tagging too broadly. It unnecessarily prohibits tagging everywhere in Phoenix.

This question of law presented in the pretrial order can be read narrowly as raising only the issue of whether the Phoenix ordinance improperly precludes solicitation from motorists even at certain street locations where ACORN contended such solicitation could be conducted safely. However, this language in the pretrial order can also be construed to present the question of whether the Phoenix ordinance's prohibition of solicitation is unduly broad by extending even to public locales other than the streets themselves.

As we are to liberally construe the language in the pretrial order, it would appear to have been an abuse of discretion to preclude ACORN from making an overbreadth challenge to the ordinance. The district court may have anticipated this possibility since the court actually proceeded to address the merits of ACORN's contention. In so doing, the district court concluded there was no evidence to suggest that the Phoenix ordinance curtailed any activity other than solicitation from vehicles at an intersection. We agree.

The "overbreadth" doctrine provides that certain broadly written statutes "may have such a deterrent effect on free speech that they should be subject to challenge even by a party whose own conduct may be unprotected." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984); *see also Thornhill v. Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed.2d 1093 (1940).

ACORN contends that even if its "tagging" of vehicles stopped at intersections is unprotected, the Phoenix ordinance may be challenged on its face as overbroad because its prohibition extends further to solicitation on the sidewalks of Phoenix, during parades or demonstrations, or on streets closed to vehicle traffic.

Even accepting ACORN's assertion that the word "street" as used in the ordinance should be broadly interpreted to include activities conducted on the sidewalks, this overbreadth argument simply represents a misreading of the Phoenix ordinance. The ordinance does not prohibit all solicitation even in the streets. It prohibits only solicitation in the streets "from the occupants of any vehicle." It is not the location of the

solicitation that is the primary focus of the ordinance, but rather the targets—occupants of vehicles. Thus the argument that solicitation is restricted on sidewalks, during parades (unless perhaps directed to those riding on floats), or on streets closed to traffic runs completely contrary to the language of the ordinance.[14] The ordinance is sufficiently narrow to withstand an overbreadth challenge.

## CONCLUSION

The Phoenix ordinance is a reasonable regulation designed to preclude solicitors from intruding upon occupants of vehicles temporarily stopped at traffic lights. It is a neutral regulation that furthers the important public interests of safety and orderly flow of traffic. As such, it is a reasonable time, place, and manner regulation which preserves the city streets for safe and peaceful use by motorists when the streets are open to vehicle traffic.[15]

AFFIRMED.

---

14. For these same reasons, the decision of *ACORN v. City of New Orleans,* 606 F.Supp. 16 (E.D.La.1984), holding a New Orleans ordinance regulating solicitation in and along the streets to be overbroad, is distinguishable from this Phoenix case. Although it is true that the district court in the New Orleans case indicated solicitation from vehicles itself was entitled to protection as occurring in public fora, the New Orleans ordinance at issue in that case was considerably broader than the Phoenix ordinance.

The New Orleans ordinance prohibited persons from standing in a "roadway" or "upon neutral ground" for the purposes of soliciting funds. *Id.* at 19 & n. 7. The court expressly noted that the New Orleans ordinance "does not distinguish between solicitors who step off the neutral ground, those who stand on the neutral ground and solicit from cars stopped adjacent to them at traffic lights, and *those who wish only to solicit from fellow neutral ground pedestrians." Id.* at 22 (emphasis added). By contrast, the Phoenix ordinance narrowly bars solicitation when directed at the occupants of vehicles.

15. Phoenix' request for attorneys' fees on appeal is denied. A prevailing defendant may recover attorneys' fees under 42 U.S.C. § 1988 only where "the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Hensley v. Eckerhart,* 461 U.S. 424, 429 n. 2, 103 S.Ct. 1933, 1937 n. 2, 76 L.Ed.2d 40 (1983). That was certainly not the case here.