**NEWS AND SUN–SENTINEL COMPANY, a Delaware corporation, d/b/a Fort Lauderdale News and Sun–Sentinel, Plaintiff,**

**v.**

**Robert O. COX, Douglas H. Danziger, Sheila Harrigan, Carlton Moore, Jim Naugle, individually as the Mayor and City Commissioners, respectively, of the City of Fort Lauderdale, and collectively as the Fort Lauderdale City Commission, the governing body of the City of Fort Lauderdale; the City of Fort Lauderdale, a municipal corporation and political subdivision of the State of Florida; and Joseph C. Gerwens, as the Police Chief of the City of Fort Lauderdale, Defendants.**

No. 88–6271–Civ.

United States District Court,
S.D. Florida.

Dec. 19, 1988.

**892**

Wilton L. Strickland, Fort Lauderdale, Fla., for plaintiff.

Dennis Lyles, City Atty., Fort Lauderdale, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER

HASTINGS, District Judge.

THIS CAUSE was tried to the Court, sitting without a jury, on October 25 and 26, 1988. After considering the testimony of witnesses, the documentary and physical evidence, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT[1]

1. Plaintiff, News and Sun–Sentinel Company, (hereinafter "NSS") is the publisher of both the Fort Lauderdale News and the Sun–Sentinel.

2. Defendant, Robert O. Cox, is the Mayor and a commissioner of the City of Fort Lauderdale. Defendants, Douglas H. Danziger, Sheila Harrigan, Carlton Moore and Jim Naugle are members of the Fort Lauderdale City Commission and Joseph C.

---

**1.** To the extent that the findings of fact are interpreted as conclusions of law, they are so considered. Conversely, to the extent that the conclusions of law are interpreted as findings of fact, they too are so considered.

Gerwens, the Chief of Police of the City of Fort Lauderdale. NSS has also brought suit against the Fort Lauderdale City Commission and the City of Fort Lauderdale (hereinafter collectively as "Defendants").

3. In March 1984, NSS instituted a "news vendor program", designed to sell newspapers and provide jobs to persons who have difficulty maintaining steady work, such as individuals from missions, probation programs, and labor pools. Those persons employed through the vendor program sell NSS newspapers to motorists on Fort Lauderdale public streets, including state-maintained roads.

4. On October 1, 1984, the Florida legislature passed Florida Statute sec. 337.406 (1987) (amending Fla.Stat. sec. 339.301 (1983)), to provide:

(1) Except when otherwise authorized by law or by the rules of the department, it is unlawful to make any commercial use of the right-of-way [2] of any state-maintained road,[3] including appendages thereto, and also including, but not limited to, rest areas, wayside parks, boat-launching ramps, weigh stations, and scenic easements. Such prohibited uses include, but are not limited to, the sale, or the display for sale, of any merchandise; the servicing or repairing of any vehicle, except the rendering of emergency service; the storage of vehicles being serviced or repaired on abutting property or elsewhere; the solicitation for the sale of goods, property, or services or for charitable purposes; and the display of advertising of any sort, except that any portion of a state-maintained road may be used for an art festival, parade, fair, or other special event if permitted by the appropriate local governmental entity.

2. Fla.Stat. sec. 334.03(16) (1987) defines "right-of-way" as "[l]and in which the state, the department, a county, or a municipality owns the fee or has an easement devoted to or required for the use as a public road."

3. Fla.Stat. sec. 334.03(17) (1987) defines "road" to include "streets, sidewalks, alleys, highways, and other ways open to travel by the public, including the roadbed, right-of-way, and all culverts, drains, sluices, ditches, water storage areas, waterways, embankments, slopes, retaining

. . . .

(4) The violation of any provision of this section or any rule promulgated by the department pursuant to this section constitutes a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083, and each day a violation continues to exist constitutes a separate offense.

For almost four years since its effective date, none of the Defendants took any action to implement enforcement of Fla.Stat. sec. 337.406.

5. The eleven state-maintained roadways in the City of Fort Lauderdale are listed below.

| Intersection | Roadway |
| --- | --- |
| Commercial Boulevard | State Road 870 |
| Oakland Park Boulevard | State Road 816 |
| Sunrise Boulevard | State Road 838 |
| U.S. 1 | State Road 5 |
| Broward Boulevard, West of Federal Highway | State Road 842 |
| SW 12th Street (Davie Boulevard) West of Federal Highway | State Road 736 |
| SW 24th Street, West of Federal Highway | State Road 84 |
| ELO East of SE 17th Avenue | State Road 842 |
| SE 17th Street, East of U.S. 1 | A–1–A |
| A–1–A itself | |
| NW 9th Avenue, North of Sunrise Boulevard | State Road 845 |

*See,* Affidavit of Joseph C. Gerwens, April 18, 1988.

6. The following series of events triggered this lawsuit. On March 31, 1988, a general notice of a City Commission meeting scheduled for April 5, 1988 was posted on the bulletin board outside Fort Lauderdale City Hall. Also on March 31, 1988, Assistant City Attorney Lindsey A. Payne sent a letter informing counsel for NSS that the regulation of newspaper vendors and newsracks was to be discussed at that meeting.[4] During that City Commission

walls, bridges, tunnels, and viaducts necessary to the maintenance of travel and all ferries in connection therewith."

4. NSS's counsel contends that this letter was not received until April 7, 1988. However, NSS's counsel admits being informed telephonically on April 4, 1988 that the news vendor program would be discussed at the Commission meeting the following day. The Amended Complaint alleges that adequate notice of such meeting was not received and therefore, NSS was unable

meeting, several Fort Lauderdale residents voiced their opinions regarding street vendors, in particular, newspaper vendors. Those residents, as well as the Defendants, urged the enforcement of Fla.Stat. sec. 337.406.[5] The Commission decided in favor of immediate enforcement of the state statute.[6]

7. On April 11, 1988, pursuant to the Commission's direction, Fort Lauderdale Police began enforcement of the statute. That same day, Officer Richard P. Schulze ticketed Gerald Lewis, a NSS employee. The citation charged Mr. Lewis with a violation of Fla.Stat. sec. 337.406, for selling newspapers from the median at the eastern intersection of Broward Boulevard and Federal Highway in the City of Fort Lauderdale, also known as State Road 842. *See* Plaintiff's Trial Exhibit 3.

8. NSS immediately filed the Complaint presently before this Court on April 11, 1988, accompanied by a motion for temporary restraining order. Pursuant to a hearing held on April 19, 1988, this Court temporarily restrained the enforcement of Fla.Stat. sec. 337.406.

9. Six days later, on April 25, 1988, pursuant to Fed.R.Civ.P. 65(b), this Court held an evidentiary hearing on NSS's motion for preliminary injunction. After considering the evidence presented and argument of counsel, the motion for injunctive relief was granted. *See, University of Texas v. Camenisch,* 451 U.S. 390, 392, 101

S.Ct. 1830, 1832, 68 L.Ed.2d 175 (1981) (citing *Canal Authority of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974)).[7] That injunction is presently in effect. NSS now requests that the Defendants be permanently enjoined from enforcing Fla.Stat. sec. 337.406 against its news vendors.

10. Defendants answered the Complaint on June 2, 1988. After seeking leave of Court, NSS filed an amended complaint on August 3, 1988. *See,* Fed.R.Civ.P. 15(a).

11. NSS's Amended Complaint contains the following eight counts.

a. Count I seeks a declaration that the citation issued to the newspaper vendor by the Fort Lauderdale Police Department is invalid because the Defendants' actions regarding the enforcement of Fla.Stat. sec. 337.406 violated Florida's Sunshine Act, Fla.Stat. secs. 286.0105 (1987) and 286.011 (1987). NSS contends that the City Commission's decision to enforce Fla.Stat. sec. 337.406 was improper because it was made without benefit of appropriate public notice. NSS also requests an award of attorneys' fees and costs.

b. Count II requests temporary injunctive relief which NSS obtained on April 19, 1988.[8]

c. Count III alleges a violation of NSS's First Amendment right to freedom of speech as applied to the states by the Fourteenth Amendment. NSS seeks costs, damages and attorneys' fees incurred in bringing this suit.

---

to prepare and present a defense of its vendor program before the Commission. *See,* Plaintiff's Composite Exhibit number 1, Letter from Ray Ferrero to Mayor Cox, dated April 11, 1988.

5. Although the Commission mentioned several state statutes at the April 5, 1988 meeting, the applicable statute, Fla.Stat. sec. 337.406, was never identified. The discussion, however, clearly involved Fla.Stat. sec. 337.406. This finding is supported by a memorandum prepared for that Commission meeting from Fort Lauderdale City Attorney Dennis Lyles to the Mayor and the Commissioners on March 31, 1988 in which the City Attorney informed the Commission of the applicable statute:

The City has the right to regulate vending that takes place on the street in a manner that creates a traffic hazard. The City has the means to enforce this right through City Code

Section 38–24(4). In addition, Florida Statutes Sections 337.406(1) and 316.2045(1) are available.

*See,* Plaintiff's Composite Exhibit number 1, City Attorney Communication No. 88–381. During this meeting, Commissioner Danziger expressed the concern that *all* street vendors, not just newspaper vendors, posed a traffic hazard. Mayor Cox echoed this concern in a subsequent meeting held on April 19, 1988.

6. *See,* Plaintiff's Composite Trial Exhibit 1.

7. Decisions of the Former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

8. Inasmuch as this relief has already been granted, Count II is moot.

d. Count IV alleges a violation of NSS's due process rights as guaranteed by the Fourteenth Amendment of the United States Constitution resulting from Defendants' failure to post adequate notice of the Commission's decision to enforce Fla.Stat. sec. 337.406. NSS also seeks costs, attorneys' fees and damages.

e. Count V alleges a violation of NSS's Equal Protection Rights pursuant to the Fourteenth Amendment of the United States Constitution. NSS requests costs, attorneys' fees and damages.

f. Count VI alleges a violation of NSS's civil rights under Title 42 U.S.C. sec. 1983 (1983) and seeks costs, attorneys' fees and damages.

g. Count VII claims a violation of NSS's rights to freedom of the press under Article I, Section 4 of the Florida Constitution and seeks costs, damages and attorneys' fees.

h. Count VIII alleges tortious interference with NSS's contractual rights pursuant to an agreement with independent contractors to distribute its newspapers. NSS requests costs, attorneys' fees and damages.

12. On August 18, 1988, Defendants answered the Amended Complaint and raised several affirmative defenses. Defendants claim that the City cannot be held liable for merely enforcing a state statute; that a declaratory action brought pursuant to 28 U.S.C. sec. 2201 does not automatically provide this Court with jurisdiction; that the claim regarding the state's Sunshine Law is moot because a public hearing was conducted; and that the Defendants have absolute immunity for the acts alleged.[9]

13. On September 28, 1988, this Court issued a scheduling order setting this cause for trial. Pre-trial matters were considered on October 25, 1988[10] and a two-day bench trial immediately followed.[11]

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction*

1. The Court has jurisdiction pursuant to 28 U.S.C. secs. 1331, 1343(a)(3) (1983), and pendent jurisdiction over the state claims.

2. Although NSS elected to proceed with its constitutional challenges against the City of Fort Lauderdale and several of its public officers, it did provide notice to the State of Florida by notifying the state attorney of the 17th Judicial Circuit in and for Broward County, Florida, pursuant to Rule 9 B, Local Rules for the Southern District of Florida and Fla.Stat. sec. 86.091 (1987).[12] *See,* First Amended Complaint at paragraph 8 and Exhibit A attached thereto. The State of Florida, however, apparently elected to remain uninvolved in this action because it filed no motion seeking to

---

**9.** Defendants also maintain that this Court should not retain jurisdiction over the case if the claims brought under 42 U.S.C. sec. 1983 are dismissed.

**10.** Defendants' motion for summary judgment was denied *ore tenus,* pursuant to Rule 56, Fed. R.Civ.P. Defendants also filed a motion *in limine* to exclude evidence of vendor activity outside of Florida, vendor uniforms, letters and cards in support of the vendor program and material prepared by Plaintiff's designated expert witness, Miles Moss. Defendants additionally moved to exclude the testimony of Mr. Moss, several vendors, independent contractors, delivery agents and mission coordinators. The motion, in all respects, was denied *ore tenus.*

**11.** Nearly two weeks after the trial was completed, the Miami Herald filed a motion for leave to file an *amicus curiae* memorandum of law. Based upon the untimeliness of the motion and this Court's determination that the parties had satisfactorily presented the case, the motion was denied. *See* Memorandum Opinion and Order Denying Motion for Leave to File an *Amicus Curiae* Memorandum of Law, 700 F.Supp. 30 (S.D.Fla.1988).

**12.** Fla.Stat. sec. 86.091 provides:

When declaratory relief is sought, all persons may be made parties who have or claim any interest which would be affected by the declaration. No declaration shall prejudice the rights of persons not parties to the proceedings. In any proceeding concerning the validity of a county or municipal charter, ordinance or franchise, such county or municipality shall be made a party and shall be entitled to be heard. If the statute, charter, ordinance, or franchise is alleged to be unconstitutional, the Attorney General or the state attorney of the judicial circuit in which the action is pending shall be served with a copy of the complaint and be entitled to be heard.

be joined as a party. Despite the constitutional challenges raised herein, this case may proceed without the participation of the State of Florida.[13] Moreover, NSS may proceed directly against the City of Fort Lauderdale because Fla.Stat. sec. 337.-406(3) authorizes "other law enforcement agencies" to enforce its provisions. The Attorney General of Florida has concluded that a municipal police department is a law enforcement agency. Op.Fla.Att'y Gen. No. 83–41 (February 27, 1985).

### B. *Discussion*

### 1. The Sunshine Act

█ In Count I and Count IV of the Amended Complaint, NSS contends that the Defendants failed to comply with Florida's Sunshine Act, Fla.Stat. sec. 286.011, which resulted in a *per se* nullification of the decision to enforce Fla.Stat. sec. 337.-406 and also resulted in a denial of NSS's rights to due process. The statute, in relevant part states:

(1) all meetings of any board or commission ... of any agency or authority of any county, municipal corporation, or political subdivision, ... at which *official acts* are to be taken are declared to be *public meetings open to the public* at all times, and no resolution, rule, or formal action shall be considered binding except as taken or made at such meeting (emphasis added).

NSS further asserts that notice of the meeting was required under Fla.Stat. sec. 286.0105 which states:

Each board, commission, or agency ... any political subdivision thereof shall include in the notice of any meeting or hearing, if notice of the meeting or hearing is required, of such board, commission, or agency, conspicuously on such notice, the advice that, if a person decides to appeal any decision made by the board, agency, or commission with respect to any matter considered at such

meeting or hearing, he will need a record of the proceedings, and that, for such purpose, he may need to ensure that a verbatim record of the proceedings is made, which record includes the testimony and evidence upon which the appeal is to be based.

While "[t]he [l]aw does not expressly require reasonable public notice for a City Council to hold a 'public meeting'[,] [t]he better view is that *reasonable* notice is mandatory, although a posted agenda is unnecessary." *Yarbrough v. Young,* 462 So.2d 515, 517 (Fla. 1st DCA 1985) (citing *Hough v. Stembridge,* 278 So.2d 288 (Fla. 3rd DCA 1973)) (emphasis in original). Here, on March 31, 1988, a general notice was posted on the bulletin board outside of City Hall. *See,* Affidavit of Kris L. Anderson, April 28, 1988. All members of the City Commission attended the meeting. Accordingly, such notice under existing Florida case law, passes muster. *Yarbrough,* 462 So.2d at 517 (notice "effective" because all members of City Commission present).

Furthermore, Fla.Stat. sec. 337.406 became effective on October 1, 1984. Although the statute may not have been enforced until April of 1988, the general public is charged with notice of that statute's existence for over three years since its enactment. During the meeting on April 5, 1988, the Commission simply decided to enforce an already existing statute. That decision cannot be considered an "official act" by the Commission under Fla.Stat. sec. 286.011 because Defendants could have begun enforcement at any time without the need to formally discuss such action with the Commission and without the benefit of public comment. On these facts, there is no violation of the Sunshine Act and, therefore, NSS's request for a declaration that Defendants' actions were in violation of the Sunshine Act is DENIED.[14]

---

13. The decision to intervene is left to the sound discretion of the Attorney General and consequently, the state is not a necessary party. *Watson v. Claughton,* 160 Fla. 217, 34 So.2d 243 (1948).

14. Despite the conclusion that Defendants did not violate the Sunshine Act, the Defendants' handling of this matter should not be condoned. Defendants were certainly aware that Plaintiff's interest would be affected by suddenly enforcing Fla.Stat. sec. 337.406. Thus, by posting one

### 2. Tortious Interference

■ In Count VIII of the Amended Complaint, NSS contends that Defendants have tortiously interfered with its contractual rights with its independent contractors.[15] NSS hires delivery agents to supervise the vendors. Each delivery agent signs an agreement which authorizes the agent as an independent contractor to deliver newspapers to a specific route for distribution to the vendors. Each agent receives a fixed fee in exchange for its services.[16]

Three elements are necessary to establish a claim for tortious interference. First, there must be an existing business relationship under which NSS has legal rights; second, there must be an intentional and unjustified interference with that relationship by the Defendants; and third, NSS must have been damaged as a result of the breach of that business relationship. *See, Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So.2d 1371 (Fla. 4th DCA 1987). Here, NSS does have an existing business relationship with its delivery agents and defendants' actions were intentional. As can be seen from this Court's treatment of NSS's First Amendment claims, *infra*, they were also unjustified. However, the evidence presented by NSS on the issue of damages was not persuasive. Here, NSS lost no vendors as a result of the temporary imposition of the sales ban. So too, any reduction in the sales of newspapers here is too remote to sustain such a claim and in any event, such a loss was not established with any precision or clarity. Therefore, NSS's claim for intentional and unjustified interference with its contractual relationships with its independent contractors is DENIED.

### 3. First Amendment Claims

■ In 3500 B.C., man began using the written word to represent abstract ideas.[17] Since then, the imprisoning of speech and hand signals on a surface has provided a means to exchange information and ideas. For this reason, among others, the founding fathers realized and sought to secure the value of "uninhibited, robust and wide-open" discussion on issues of public importance, *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Thus, the First Amendment succinctly guarantees that "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const.Amend. I.[18] Although the amendment is directed at conduct by the federal government, the rights provided for therein apply with equal force to the States through the Due Process clause of the Fourteenth Amendment. *Schnieder v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939).

This Court must first determine whether it need reach the constitutional questions raised by NSS. If the statute can be construed in such a way as to avoid a constitutional challenge, that interpretation must be applied. *U.S. v. Grace*, 461 U.S. 171, 175–76, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). NSS has asserted that the statute cannot be enforced against it because the sale of its newspapers is not a "com-

---

announcement on a bulletin board and sending Plaintiff a letter which was not received until after the meeting, the Commission meeting became little more than a political charade. If Defendants were truly concerned about the interests of *all* its citizens, it should have provided an earlier notice of the meeting, perhaps by newspaper publication, to demonstrate this concern. It did not, and those actions unflatteringly speak for themselves.

15. Because this claim sounds in tort, Defendants would seem to enjoy immunity from liability under Fla.Stat. sec. 768.28 (West 1986) for the exercise of police power. *See, Neumann v. Davis Water and Waste, Inc.*, 433 So.2d 559, 563 (Fla. 2d DCA 1983) and cases cited therein. Defendants did not, however, raise this defense

and the Court will, therefore, address the merits of the claim.

16. The standard delivery agent agreement was entered in evidence as Plaintiff's Trial Exhibit number 2.

17. Louis E. Ingelbert, *Press Freedoms: A Descriptive Calendar of Concepts, Interpretations, Events and Court Actions from 4000 B.C. to the Present* 4 (1987) (hereinafter *Press Freedoms*).

18. Distributors of printed literature have a worldwide documented history of persecution. In England for instance, as far back as 1530, sellers of heretical publications were executed or burned at the stake. *Press Freedoms* at 24.

mercial activity" when viewed in light of freedom of speech and press guarantees. If this is so, the constitutional question can be avoided.

By its own terms, the statute applies to "any commercial use" of state-maintained roads, although it does not define the phrase "commercial use." Black's Law Dictionary defines "commercial" as a "[g]eneric term for most all aspects of buying and selling." Black's Law Dictionary 245 (5th ed.1979). Clearly, the selling of newspapers constitutes a commercial activity. It follows, therefore, that the presence of a "commercial feature" in NSS's newspaper sales constitutes a "commercial use" of state-maintained roads under Fla.Stat. sec. 337.406, rendering it enforceable against NSS. This conclusion, however, does not foreclose First Amendment protection.

In *Breard v. City of Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), a vendor challenged a regulation which banned door-to-door solicitations of national periodicals in residential areas. The regulation was upheld on the basis that privacy interests outweighed the rights to distribute magazines on private property by uninvited entry. The Court recognized, however, that "the fact that periodicals are sold does not put them beyond the protection of the First Amendment. The selling, however, brings into the transaction a commercial feature." *Id.* at 642, 71 S.Ct. at 932.[19] This is so because the commercial aspects of the transaction are "intertwined with informative and perhaps persuasive speech [and] views on economic, political, or social issues, and ... without solicitation the flow of such information and advocacy would cease." *Village of Schaumberg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980) (discussing street and door-to-door charitable solicitations). Thus, the distribu-

tion of newspapers for sale does not automatically transform the transaction into an unprotected commercial activity.

Because the Florida statute in this case has been enforced in a manner which prohibits the very *sale* of newspapers on state-maintained roads, the Court must first consider what protection the First Amendment offers to the seller of newspapers, and then, judge the statute against the appropriate standards which take into account the limitations, if any, that may be placed on those First Amendment guarantees.

a. *The Right to Distribute for Sale*

It is well-settled that distributors of printed material are afforded First Amendment protection. Embodied in the First Amendment's freedom of press concept is the notion that "liberty of circulating is as essential to that freedom as liberty of publishing; indeed without the circulation, the publication would be of little value." *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877) (discussing transportation of printed matter through mails). The freedom of speech and press guarantees carry with them the concomitant right to distribute and circulate printed materials, even when such literature is offered for sale. *See e.g., Village of Schaumberg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Philadelphia News, Inc. v. Borough of Swarthmore,* 381 F.Supp. 228, 240 (E.D.Pa.1974). The commercial aspect of distribution, be it direct or incidental, cannot talismanically lift the First Amendment's shroud of protection subjecting the distributor to all forms of

---

**19.** In dissent, Justice Black joined by Justice Douglas, considered the liberty of the press concept to reach further than suggested by the majority opinion:

The constitutional sanctuary for the press must necessarily include liberty to publish and circulate. In view of our economic system, it must also include freedom to solicit

paying subscribers.... I believe that the First Amendment, interpreted with due regard for the freedoms it guarantees, bars laws like the present ordinance which punish persons who peacefully go from door to door as agents of the press.

341 U.S. at 650, 71 S.Ct. at 936.

regulation.[20] To do so would provide the means for Government to accomplish indirectly what it cannot command directly—control of the press. Accordingly, the First Amendment guarantees NSS the right to distribute its newspapers for sale.

### b. The Forum of Distribution

The First Amendment right to distribute is not absolute; it is the nature of the forum that determines the degree of protection. *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The Supreme Court has identified three types of fora; "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Frisby v. Schultz*, — U.S. —, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988) (*quoting Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985)).

Fla.Stat. sec. 337.406 plainly attempts to prohibit commercial use of "state-maintained roads." Public streets and sidewalks are the "archetype of a traditional public forum," *Frisby*, 108 S.Ct. at 2499, because of their usage for public assembly and debate. *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Therefore, the streets of Fort Lauderdale are traditional public fora.[21] Accordingly, Fla.Stat. sec. 337.406 must be judged against the standards established for restrictions on speech in this type of forum.

### c. Restrictions of Time, Place and Manner

NSS contends that the statute is overbroad because it bans newspaper sales on all state-maintained roadways at all times and less intrusive means exist by which the City may further its interests.[22] The City asserts that the restrictions imposed by Fla.Stat. sec. 337.406 are valid as reasonable time, place and manner regulations.

**20.** Although literature offered for sale may be "commercially motivated", it is not "commercial speech", *Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), which is afforded less protection under the First Amendment. "[S]peech does not lose its protected status because the speaker seeks a contribution." *Acorn v. City of New Orleans*, 606 F.Supp. 16, 20 (E.D. La.1984).

**21.** The Court intimates no view on the question of whether public streets lose their public fora character while they remain open to motor vehicles since neither party raised the issue and, in the context of this case, it is unnecessary to resolve it. In this case, the statute sweeps so broadly, proscribing all commercial activity on state-maintained roads, including sidewalks and other traffic-neutral gathering places, that it would be difficult to justify it even under the less rigorous standards applied to other types of public fora. *See e.g., Bd. of Airport Com'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987); *ACORN v. City of Phoenix*, 798 F.2d 1260, 1266–67 (9th Cir.1986). In light of this blanket prohibition, the Court assumes *arguendo* that a traffic congested street retains its public forum nature and does not become "some special type of enclave", *United States v. Grace*, 461 U.S. 171, 180, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983), which loses its historically recognized character for First Amendment purposes.

**22.** While the Court is mindful that striking down a statute as overly broad is "strong medicine" to be invoked only "as a last resort",

*Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973), the expansive sweep of Fla.Stat. sec. 337.406 allows for the overbreadth doctrine to be applied. A law may be declared unconstitutional when its overbreadth is substantial in relation to its plainly legitimate sweep. *Id.* at 615, 93 S.Ct. at 2918. The doctrine has "also been used to describe a challenge to a statute that in all applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest ..." *Sec. of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 965 n. 13, 104 S.Ct. 2839, 2851 n. 13, 81 L.Ed.2d 786 (1984).

More recently, the Supreme Court has explained that a statute may be invalidated on its face only if its overbreadth is "substantial." *Bd. of Airport Com'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 107 S.Ct. 2568, 2571, 96 L.Ed.2d 500 (1987) (citations omitted). To do so, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* 107 S.Ct. at 2572. The statute at issue in this case reaches the activity of other newspaper vendors, charitable solicitors and religious fundraisers on any state-maintained street, sidewalk or elsewhere. Thus, it may be invalidated on its face because its sweeping ban substantially threatens others not before the Court who may desire to engage in, but refrain from, such legally protected conduct.

These regulations must meet three requirements to withstand a constitutional challenge. The State may "enforce regulations of time, place and manner of expression provided, (1) the regulation may not discriminate on the basis of content or subject matter," *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981); (2) it is narrowly drawn to "serve a significant governmental interest", *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976); and (3) it "leave[s] open ample alternative channels of communication of the information." *Id. See also, Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55. Put another way, the Court must determine "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Lakewood v. Plain Dealer Publishing Co.*, — U.S. ——, 108 S.Ct. 2138, 2147, 100 L.Ed.2d 771 (1988) (quoting *Grayned v. Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972)).

### (1) Content Neutrality

A content-neutral regulation makes no distinction between prohibited and permitted speech. *Virginia Pharmacy*, 425 U.S. at 771, 96 S.Ct. at 1830. In this case, it is clear that Fla.Stat. sec. 337.406 is content-neutral because on its face, the statute makes no distinction between classes of prohibited and permitted speech, nor does it single out any particular group.[23] It applies evenhandedly to every individual and organization which makes "commercial use" of state-maintained roads. Accordingly, the Court must consider whether the statute passes constitutional muster under the remaining factors.

### (2) Narrowly Tailored Significant Governmental Interest

The City correctly asserts, and NSS has not challenged the fact, that traffic control and safety are substantial governmental goals which serve legitimate interests for the exercise of police power. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–508, 101 S.Ct. 2882, 2892–93, 69 L.Ed. 2d 800 (1981). "It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous." *International Society for Krishna Consciousness of New Orleans v. City of Baton Rouge*, 668 F.Supp. 527, 530 (M.D.La. 1987).

Invariably, newspaper sales by vendors may not only pose a safety hazard but also cause delays and disruptions to traffic as vehicles become detained at traffic lights while drivers fumble for money and vendors provide change.[24] Because the City has significant interests in regulating the conduct of pedestrians in its streets while motor vehicles are present, this Court must determine whether the statute is "narrowly tailored" to serve the City's significant governmental interest. *Perry*, 460 U.S. at 45, 103 S.Ct. at 955.

A narrowly tailored statute "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 108 S.Ct. at 2502. The existence of feasible and "alternative means [that] are available to the state ... would both serve the state's interest and exert a less severe impact on first amendment rights", *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 675 (11th Cir.1984), thereby casting doubt on the assertion that the statute is a narrowly tailored method of maintaining safety and ensuring the flow of traffic.

23. The statute does not prohibit all types of speech or expressive conduct. It is unnecessary, however, to decide what other activities are within the terms of the statute because the statute at least prohibits the conduct at issue here. Further, the City has interpreted and applied the statute to prohibit charitable solicitations and any other type of activity involving the exchange of money. It is therefore evident

that the prohibition contained in Fla.Stat. sec. 337.406 is content-neutral.

24. Over the objection of NSS, the City introduced into evidence and played for the Court a videotape demonstrating these very problems. NSS's post-trial objection regarding this matter, filed on November 10, 1988, is denied.

In *Houston Chronicle Publishing Co. v. City of Houston*, 620 S.W.2d 833 (Tex.Civ. App.1981), a Texas court invalidated a city ordinance banning sales of newspapers to occupants of motor vehicles while such vehicles were on public streets. Although the ordinance permitted honor boxes and sidewalk sales which did not impede pedestrian traffic, the court held the prohibition to be an abridgment of the right to free speech and press. The Florida statute at issue in this case forbids "any commercial use of the right-of-way of any state-maintained road, including appendages thereto" (emphasis added). The prohibition extends, but is not limited to, sidewalks,[25] "rest areas, wayside parks, boat-launching ramps, weigh stations, and scenic easements." Fla.Stat. sec. 337.406(1). A similar ordinance was considered in *Welton v. City of Los Angeles*, 18 Cal.3d 497, 556 P.2d 1119, 134 Cal.Rptr. 668 (1976). The Supreme Court of California held that the sweeping nature of one subdivision of the ordinance was unconstitutional because it banned entirely "the sale of books, magazines, pamphlets, maps and other constitutionally protected material at locations historically associated with the exercise of First Amendment rights."[26] *Id.* 556 P.2d at 1123, 134 Cal.Rptr. at 672. The Court did uphold the validity of another subdivision of the ordinance which proscribed the sale of printed material on the roadway of any street while permitting sales on parkways and sidewalks. This latter provision was found to be a reasonable place restriction in light of the public safety interest of prohibiting dissemination of any material while in the path of motor vehicles. *Id.*

The statute here, similar to the ordinance in *Houston Chronicle*, is unreasonably restrictive because it "ban[s] newspaper sales by persons of all ages to occupants of all motor vehicles located on public property ... regardless of the time of day or night and regardless of whether the cars are moving, standing, parked or even not in the traffic lanes." *Houston Chronicle*, 620 S.W.2d at 937. In contrast, unlike the ordinance upheld in *Welton*, the statute here sweeps broader by including all "commercial" activity on sidewalks, rest areas and other traffic-neutral locations. For this reason, the statute is not subject to any limiting construction which could cure its constitutional defect.

The statute bars any commercial activity by anyone, at any time, at any place on a state-maintained road.[27] It is far from being carefully drawn to meet the City of Fort Lauderdale's interests. It makes no attempt to restrict activity to certain hours, days or nights, or even seasons. *See e.g., Beckerman v. City of Tupelo*, 664 F.2d 502, 512 (5th Cir. Unit A 1981). It does not distinguish between minors and adults, the latter of which are presumably more safety-conscious. It fails to take into account the fact that actual traffic hazards may vary with the level of traffic flow which exists at each of the state roads; instead all such roads come within its broad sweep. Finally, Fla.Stat. sec. 337.406 does not even

---

**25.** See definition of "road" contained in Fla.Stat. sec. 334.03(17), *supra*, n. 3.

**26.** The Court in *Welton* did cure this constitutional infirmity by finding that the ordinance could be construed to apply to the sale of "goods, wares and merchandise," and thus, not printed matter. *Id.* 556 P.2d at 1124, 134 Cal. Rptr. at 673. No similar saving construction is available in this case.

**27.** The statute does appear to provide for some exceptions. The "commercial use" of the roads is prohibited "[e]xcept when otherwise authorized by law or by the rules of the department." Fla.Stat. sec. 337.406(1). Neither party has indicated whether any such authorizations exist, although the political campaigning exception contained in Fla.Stat. sec. 316.2045 has been brought to the Court's attention. Presumably,

however, the political campaigning accomplished on the street does not involve the solicitation of money, and therefore, would fall outside the statutory language of "commercial use".

In addition, the statute itself provides exceptions for "an art festival, parade, fair, or other special event if permitted by the appropriate local governmental entity." Fla.Stat. sec. 337.-406(1). These occurrences, and the statute's "other special event" language, seem to characterize activities of the type that, by their very nature, require cordoning off portions of the street. In this regard, they are irrelevant to this case because they differ from other "commercial" uses of the street in that there would be no flow of traffic, and thus, no mixing of pedestrians and motor vehicles.

permit any so-called "commercial" activity to occur on the sidewalks of those state-maintained roads.

The City of Fort Lauderdale argues that safety is its primary concern and that street solicitation is unsafe under any condition, but this argument belies the very language of the statute. The statute prohibits only "commercial" activity on state-maintained roads. In light of the statute's language, the *sale* of newspapers is unlawful, but the *free* distribution of them on the very same street is not. While charitable and religious solicitations would be impermissible, the free distribution of charitable and religious flyers by the same individuals would not run afoul of the statute. Taking this argument to its logical conclusion, it is possible for two Girl Scouts to be on the same street at exactly the same time with one selling Girl Scout Cookies and the other giving away free samples. Under Fla. Stat. sec. 337.406, only the Girl Scout *selling* the cookies has committed a misdemeanor in the second degree, Fla.Stat. sec. 337.406(4), while the other Scout may continue her free distributions.

Fla.Stat. sec. 337.406 is fundamentally incompatible with the First Amendment. There is no basis under the statute as written to allow certain activity on state-maintained roads when no money exchanges hands, yet condemn the same conduct for reasons of safety and traffic control when it takes on a commercial aspect. Accordingly, the Court finds that Defendants have failed to meet their burden that the statute is a narrowly drawn method of maintaining safety and ensuring the flow of traffic because less restrictive means are available to serve the state's interests.

### (3) Alternative Channels of Communication

Although NSS may sell its newspapers on any non-state maintained road and, therefore, the statute preserves ample alternative channels of communication, in the absence of a narrowly-tailored restriction as presented in this case, the existence of adequate alternative channels of communication cannot justify the restriction of First Amendment rights. "[T]he streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939).

For these reasons, Fla.Stat. sec. 337.406 is declared unconstitutional under the First Amendment and defendants are permanently enjoined from its enforcement.[28]

### 4. Title 42 U.S.C. sec. 1983

In Count VI, NSS alleges a violation of its civil rights under 42 U.S.C. sec. 1983. That statutory section provides only remedies for deprivation of rights established elsewhere in federal statutory and constitutional law. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Consequently, a sec. 1983 claimant must establish that Defendants: (1) deprived plaintiff of some right or privilege secured by the Constitution and laws of the United States; and (2) acted under color of state law. *Lugar v. Edmonson Oil Co.,*

---

**28.** Count VII alleges a violation of NSS's rights to freedom of the press under Article I, Section 4 of the Florida Constitution. Case law has interpreted the scope of guarantees under the Florida Constitution to be the same as those under the United States Constitution. "Florida courts tend to merge the two limitations to the point that federal and state cases are cited interchangeably." *Florida Canners Association v. State, Department of Citrus,* 371 So.2d 503, 517 (Fla. 2d DCA 1979). This Court, therefore, has addressed the claim for violation of the Florida Constitution through the United States Constitutional analysis.

As to Count V of the Amended Complaint, which alleges a violation of NSS's rights to equal protection under the Fourteenth Amendment of the United States Constitution, First Amendment claims and Equal Protection claims such as these frequently become intertwined. *See, Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 1726 n. 3, 95 L.Ed.2d 209 (1987) (Court need not address both claims if First Amendment complaint is vindicated). Since Fla.Stat. § 337.406 "directly implicates freedom of the press, [this Court] analyzes it primarily in First Amendment terms," *Id.,* and because the First Amendment claim is vindicated, there is no need to reach the Equal Protection issue.

*Inc.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982).[29]

The second question is easily answered. "[T]he party charged with the deprivation must be a person who may fairly be said to be a state actor," *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2754, and "[t]he involvement of a state official ... plainly provides the state action essential to show a direct violation of [plaintiff's civil rights]." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970) (citations omitted). Here, the enforcement of Fla.Stat. sec. 337.406 by the Fort Lauderdale police establishes the requisite element of state action to establish a section 1983 claim.

Turning to the element of deprivation of some constitutional or federally created right, for reasons discussed above, the Court finds that NSS has been deprived of its First Amendment right to freedom of speech and press. Accordingly, NSS has established a claim pursuant to 42 U.S.C. sec. 1983. NSS's evidence concerning damages, as discussed above in section B(2), was neither precise nor immediate. Because NSS's monetary damages, if any, are too speculative, the Court awards NSS nominal damages for this claim. *See, Redding v. Fairman,* 717 F.2d 1105, 1119 (7th Cir.1983) (nominal damages appropriate in 1983 action where no monetary loss is established); *Craig v. Carson,* 449 F.Supp. 385, 396 (M.D.Fla.1978) (same).

### III. CONCLUSION

In summary, NSS's claims for violations of the Sunshine Act and for tortious interference are DENIED. NSS's claims for violation of freedom of speech under the United States Constitution, the Florida Constitution and 42 U.S.C. sec. 1983 are GRANTED.[30]

Fla.Stat. sec. 337.406 is hereby declared unconstitutional and a permanent injunction shall take effect forthwith. As NSS' presentation regarding monetary loss was merely speculative, an award of compensatory damages is DENIED. NSS is awarded nominal damages in the amount of one dollar ($1.00).[31] Costs to be paid by Defendants.

DONE AND ORDERED.

---

**29.** A claimant need not suffer monetary damages to prevail in an action for the denial of civil rights. *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978).

**30.** This Court need not grant or deny NSS's claim under the Equal Protection clause, as it is intertwined with the Freedom of Speech analysis. See n. 28, *supra.*

**31.** This Court retains jurisdiction for the sole purpose of assessing costs and, if appropriate,

attorneys' fees. Within twenty (20) days from the date of this Order, NSS is directed to file a motion, if any, for costs and/or attorneys' fees. If fees are sought, NSS shall state the bases for its request. NSS should include with any such request, time sheets, bills and appropriate affidavits. Defendants shall have ten (10) days to respond to any such motion; NSS shall have five (5) days to reply.