Rehearing en banc granted by order filed 4/21/99;
published opinion filed 2/19/99 is vacated.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RITA WARREN,
Plaintiff-Appellant,

v.                                                             No. 98-1059

FAIRFAX COUNTY,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T.S. Ellis, III, District Judge.
(CA-97-119-A)

Argued: September 23, 1998

Decided: February 19, 1999

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
BULLOCK, Chief United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Chief Judge Bullock wrote the major-
ity opinion, in which Judge Williams joined. Judge Murnaghan wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Victor Michael Glasberg, VICTOR M. GLASBERG &
ASSOCIATES, Alexandria, Virginia, for Appellant. James Patrick
Taves, Senior Assistant County Attorney, Fairfax, Virginia, for
Appellee. **ON BRIEF:** Jeanne Goldberg, VICTOR M. GLASBERG

& ASSOCIATES, Alexandria, Virginia; Mary Bauer, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellant. David P. Bobzien, County Attorney, Karen L. Gibbons, Assistant County Attorney, Fairfax, Virginia, for Appellee.

_____

**OPINION**

BULLOCK, Chief District Judge:

Appellant, Rita Warren (Warren), seeks to mount religious displays in a landscaped median located in front of the Fairfax County Government Center Complex (the Complex). Appellee, Fairfax County (the County), has adopted a regulation which designates the Complex, including the landscaped median, for use by County citizens, employees, and certain nonprofit organizations. The County has refused to issue Warren a permit to erect her displays because she is not within the class of speakers identified in the County's regulation. The issue before this court is whether the County's regulation violates Warren's rights under the First and Fourteenth Amendments. Finding that the County's regulation is viewpoint neutral and reasonable, we affirm.

I.

Warren, who is a devout Christian but is not a member of an organized religion, seeks to spread a message of love, hope, and peace by mounting religious displays at the Complex at certain times of the year. Specifically, she wants to erect a creche and a cross outside the Complex during the Christmas and Easter seasons. Warren is not a resident of Fairfax County, but is a resident of Fairfax City.[1]

The Complex comprises three buildings in which over 2,500 County employees work, and adjacent grounds. The largest of the buildings is the Government Center building, which is the site of county government offices. A horseshoe-shaped driveway runs in

_____

[1] Fairfax City, Virginia, is a separate and distinct jurisdiction from Fairfax County, Virginia. J.A. at 50.

2

front of the Government Center building. This driveway includes a landscaped median area known as the "Center Island." Warren seeks to erect her displays in this Center Island.

The County's Procedural Memorandum # 08-05 (the Memorandum) governs the use of all County common areas at the Complex, including the Center Island. The Memorandum declares that the County's policy is to encourage "use of the common areas of the Government Center Complex by Fairfax County nonprofit organizations and individual citizens of Fairfax County for civic, cultural, educational, religious, recreational, and similar activities." J.A. at 56. To that end, the Memorandum establishes procedures for obtaining a use permit. Significantly, the Memorandum specifically identifies the following groups as being allowed to use the Complex, including the Center Island: County residents, County employees, and County nonprofit groups. Based on this provision, the County has declined to issue Warren a permit to display her creche and cross in the Center Island area.

Warren instituted this suit in response to the County's actions. Warren alleged the County, in enforcing the use provision, has violated and will continue to violate her First Amendment rights to free speech and to petition the government. Warren also maintained that the County has violated and will continue to violate her Fourteenth Amendment equal protection rights.**2** Warren sought a permanent injunction prohibiting the County from enforcing the use provision.

On cross-motions for summary judgment, the district court granted summary judgment in favor of the County. The district court, applying the standard of constitutional scrutiny applicable to nonpublic fora

_____

**2** In her complaint, Warren also asserted that the County's use provision violated the Religious Freedom and Restoration Act (RFRA). The district court dismissed this claim in view of the Supreme Court's holding in City of Boerne v. Flores, 521 U.S. 507 (1997), that the RFRA was unconstitutional. J.A. at 21. Warren also challenged an attendance requirement in the Memorandum which required that any display be attended by an adult at all times. The district court upheld this restriction as a content-neutral, reasonable time/place/manner restriction. Warren does not challenge these findings of the district court on appeal.

3

under established Supreme Court precedents, first found the use provision did not violate Warren's First Amendment rights. The district court then found that, because the use provision did not violate the First Amendment, Warren's Fourteenth Amendment claim also failed.

On appeal, Warren argues that the district court improperly analyzed the County's use provision under the more lenient nonpublic-forum standard, as opposed to the more strict, traditional public-forum standard. Warren further argues that the use provision violates the First Amendment under the traditional public-forum standard and that the district court therefore erred in dismissing her claims under the First and Fourteenth Amendments.

II.

The standard of review in this case is <u>de novo</u> . <u>Henson v. Liggett Group, Inc.</u>, 61 F.3d 270, 274 (4th Cir. 1995).

It is well settled that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." <u>United States Postal Serv. v. Council of Greenburgh Civic Ass'ns</u>, 453 U.S. 114, 129 (1981). Rather, an individual's right to express herself on government property depends upon the type of property involved. In this regard, the Supreme Court has "`identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum.'" <u>Arkansas Educ. Television Comm'n v. Forbes</u>, 523 U.S. ___, 118 S. Ct. 1633, 1641 (1998) (quoting <u>Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.</u>, 473 U.S. 788, 802 (1985)). "Traditional public fora are defined by the objective characteristics of the property, such as whether, `by long tradition or by government fiat,' the property has been `devoted to assembly and debate.'" <u>Id</u> . (quoting <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983)). Traditional public fora include areas such as streets, sidewalks, and parks, areas which have been used historically as locations for free expression. <u>See United States v. Grace</u>, 461 U.S. 171, 177 (1983). Use of traditional public fora may be regulated only by content-neutral time, manner, and place restrictions, or by content-based restrictions which are tailored narrowly to serve a compelling government interest. <u>Perry</u>, 460 U.S. at 45.

4

Designated public fora are areas which the government has purposefully opened to the public for free expression. Arkansas Educ., 118 S. Ct. at 1641. Government regulations restricting speech in a designated public forum are scrutinized under the same standards as a traditional public forum. Perry, 460 U.S. at 46.

Government properties other than traditional or designated public fora are "either nonpublic fora or not fora at all." Arkansas Educ., 118 S. Ct. at 1641. "Control over access to a nonpublic forum can be based on subject matter and subject identity so long as the distinctions drawn are reasonable in light of the purposes served by the forum and are viewpoint neutral." Cornelius, 473 at 806.

Within this tripartite framework the Supreme Court has recognized that "[a] [designated] public forum may be created for a limited purpose such as use by certain groups, e.g., Widmar v. Vincent, [454 U.S. 263 (1981)] (student groups), or for the discussion of certain subjects, e.g., City of Madison Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n, [429 U.S. 167 (1976)] (school board business)." Perry, 460 U.S. at 46 n.7. Where the speaker comes within the class or purpose for which a designated public forum is made generally available, the government is bound by the same standards which apply in a traditional public forum. Arkansas Educ., 118 S. Ct. at 1641. Where, however, the speaker does not come within the class or purpose of the forum, the nonpublic forum standard applies. See Perry, 460 U.S. at 48 (in a nonpublic forum or even in a designated public forum "the constitutional right of access . . . extend[s] only to entities of similar character" to which the government has permitted access); see also Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir. 1991) ("in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre").

Warren first contends that the district court erred in concluding that the Center Island was not a traditional public forum. We disagree. Initially, we note that the Supreme Court has "rejected the view that traditional public forum status extends beyond its historic confines." Arkansas Educ., 118 S. Ct. at 1641. The Center Island is not a street, sidewalk, or a park. Instead, it is a median dividing a u-shaped drive-

5

way. As the district court correctly noted, landscaped medians such as the Center Island are designed primarily for aesthetic purposes such as plantings and have not been used historically as a location for public expressive activity. As such, the Center Island is not a traditional public forum.**3**

_____

**3** The dissent argues that the Center Island is a traditional public forum because it shares the physical characteristics of a park or mall and is part of a class of property which, by history and tradition, has been opened and used for expressive activity. Alternatively, the dissent argues that the Center Island is a traditional public forum because it is "part and parcel" of a street or sidewalk. With respect to its latter argument, the dissent relies on a number of cases from other circuits which have treated median strips as part of a street or sidewalk. See, e.g., Sloman v. Tadlock, 21 F.3d 1462, 1465 (9th Cir. 1994); Ater v. Armstrong, 961 F.2d 1224, 1225 (6th Cir. 1992). We did not consider this argument because the district court specifically found that the Center Island was not a sidewalk or street, J.A. at 24, and Warren did not raise this argument on appeal.

Indeed, in the three questions presented for review and in the majority of her brief, Warren argues that the Center Island should be characterized as a designated public forum. In only one and one-half pages of her forty-seven page brief does Warren address the traditional public forum issue, and she cites only two cases, Act-Up v. Walp, 755 F. Supp. 1281 (M.D. Pa. 1991), and Women Strike for Peace v. Morton, 472 F.2d 1273 (D.C. Cir. 1972). While it is clear that certain parts of the grounds of capitol complexes have been held to be traditional public fora, see Edwards v. South Carolina, 379 U.S. 229 (1963), the court in Act-Up itself recognized that this does not mean that the entire area at a government center is a traditional public forum. See Act-Up, 755 F. Supp. at 1287 (holding that the gallery of a state legislative chamber was not a traditional public forum); cf. United States v. Grace, 461 U.S. 171, 175 (1983) (where regulation at issue related to the United States Supreme Court building and its grounds, including plaza and surrounding promenade, lawn area, steps and sidewalks, the Supreme Court expressly limited its consideration to the sidewalk area). Similarly, Warren's reliance on Women Strike for Peace is misplaced because that case involved a national park, not a median area comparable to the Center Island. In this case, there is no evidence that the Center Island or similar median areas have been used historically as a location for speech activity. In the absence of such evidence, we cannot conclude that the Center Island is a traditional public forum. See International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680 (1992) (holding that airport terminal was not a traditional public forum because "the tradition of airport activity does not demonstrate that airports have historically been made available for speech activity").

6

Next, Warren argues that the County, in its Memorandum, has expressly designated the Center Island as an unlimited public forum. Again, we disagree. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." Cornelius, 473 U.S. at 802. Thus, to ascertain whether the Center Island is a designated public forum as to Warren, we must look to the County's policies and practices to determine whether the County intended to designate the Center Island as a public forum. Id. If the government's intent remains unclear, we should then look to the "nature of the property and its compatibility with expressive activity to discern the government's intent." Id. However, we will not find that "a public forum has been created in the face of clear evidence of contrary intent." Id. at 803.

To support her position that the County has designated the Center Island as a public forum, Warren relies principally on the Memorandum, which provides that it is the County's "policy . . . to encourage the use of common areas of the Government Center Complex by Fairfax County nonprofit organizations and individual citizens of Fairfax County for civic, cultural, educational, religious, recreational, and similar activities of a nonprofit nature." J.A. at 56. The next section of the Memorandum, "Who May Reserve the Facilities of the Government Center Complex," expressly opens the Complex for use by county residents, county employees, and any nonprofit organization which has an office in or serves the citizens of the county. J.A. at 58. Thus, while the Memorandum undoubtedly evidences the County's intent to open the Complex and the Center Island to a broad spectrum of topics, it also provides clear evidence the County did not intend to open this forum to speakers such as Warren, who is neither a county resident nor an employee. As noted above, we cannot find that the County intended to designate the Center Island as a public forum for speakers such as Warren in the face of a clear indication from the County that it did not intend to do so. See Cornelius, 473 U.S. at 803.

At most then, the County's Memorandum designates the Complex, including the Center Island, as a limited public forum. We do not need to decide, however, whether the Center Island is a limited public forum or a nonpublic forum in this case because, as Warren falls outside the class to whom the County has opened the Center Island, the

7

level of scrutiny to be applied to the County's regulation remains the same. See Perry, 460 U.S. at 48.**4**  That is, the County may exclude Warren from the Center Island so long as the restriction is viewpoint neutral and reasonable in light of the purposes served by the forum. See id.; Cornelius, 473 U.S. at 806.

First, it is undisputed that the use provision is viewpoint neutral. By its express terms, the Memorandum does not seek to restrict or limit the viewpoints of any speaker. Instead, as the district court correctly noted, it simply does not open the Complex to speakers who do not have the requisite connection with the County, regardless of the views that they may hold. Indeed, if Warren was a county resident or employee or represented a nonprofit organization serving the county, she could erect a religious creche in the Center Island.

At this point, then, the use provision "`need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'" United States v. Kokinda, 497 U.S. 720, 730 (1990) (plurality opinion) (quoting Cornelius, 473 U.S. at 808). The reasonableness of the restriction "must be assessed in light of the purpose of the forum and all the surrounding circumstances." Cornelius , 473 U.S. at 809. As the district court noted, the Complex, including the Center Island, was presumably built with funds provided by the citizens of the county and their tax dollars support the maintenance of the Center Island. Given that the Center Island is adjacent to a government center which has the purpose of conducting county business and serving county citizens, the Memorandum reasonably opens the Complex and Center Island to those citizens as well as to individuals or organizations who serve the County. See Multimedia Pub. Co. of South Carolina, Inc. v.

_____

**4** The district court concluded the Center Island was a limited public forum and, in so doing, relied upon a line of cases from the Second Circuit which have characterized the limited public forum as a "subspecies" of the designated public forum. J.A. at 9-12 & n.9; see, e.g., Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir. 1991); Fighting Finest, Inc. v. Bratton, 95 F.3d 224, 229 (2d Cir. 1996); Calash v. City of Bridgeport, 788 F.2d 80 (2d Cir. 1986). Because we do not need to decide whether the Center Island is a limited public forum or nonpublic forum in this case, we express no view as to the Second Circuit's approach to limited public fora in this case.

8

Greenville-Spartanburg Airport Dist., 991 F.2d 154, 160 (4th Cir. 1993) (restriction may be justified by "appeals to common sense and logic"). Moreover, it is reasonable for the County to conclude that limiting the use of the Center Island to County-related persons and entities will save the County money in maintenance and supervision expenses.

III.

We also agree with the district court's conclusion that, because Warren has no First Amendment right to speak in the Center Island, Warren's claim under the Fourteenth Amendment must also fail. This is because, in the absence of a First Amendment violation, the County's use provision does not burden a fundamental right. This means that the provision need only rationally further a legitimate state interest. See Perry, 460 U.S. at 54. For the same reasons that the use provision is reasonable, it also rationally furthers legitimate interests of the County. See id.

IV.

Because the County's use provision is reasonable and viewpoint neutral and because it rationally furthers a legitimate state purpose, Warren's claims under the First and Fourteenth Amendments must fail. We therefore affirm the district court's order granting summary judgment in favor of the County.

AFFIRMED

MURNAGHAN, Circuit Judge, dissenting:

I respectfully dissent from the majority. I would hold that the Center Island mall is a traditional public forum since it shares the objective characteristics of such fora. Alternatively, I would hold that Fairfax County (the "County") designated the Center Island area a public forum and that the County's attempt to limit the class of those who may benefit from that designation to residents and employees is unreasonable in light of the objective characteristics and purposes of the property.

9

I.

Fairfax County seeks to privilege the residents of the County, County employees, and County non-profits[1] (hereinafter collectively referred to as "residents" or "qualified persons") by allowing only these groups to use the facilities and grounds of the Fairfax County Government Center Complex for personal or private use. The County issued a Memorandum in November, 1996, which states that it is County policy "to encourage use of the common areas of the Government Center Complex by [qualified persons] for civic, cultural, educational, religious, recreational and similar activities ...." Fairfax County Procedural Memorandum No. 08-05 at 2 (Nov. 18, 1996) (the "Memorandum"). The Government Center Complex serves as the capitol of the County, housing various County executive employees, as well as the meeting place of the County Board of Supervisors. At issue before us is the constitutionality of the Memorandum as applied to the exterior grounds of the Government Complex, specifically a wide, landscaped mall lying directly in front of the County seat known as the "Center Island".

Rita Warren lives in Fairfax City, an independent jurisdiction from Fairfax County, but one entirely surrounded by the County.[2] In November, 1996, Ms. Warren filed for a permit to erect a holiday display on the Center Island mall. The County, acknowledging that a qualified person would be able to mount exactly the same display, denied Ms. Warren a permit because she was not a County resident. Believing the basis for this denial to be contrary to the spirit of our country and its constitutive document, Ms. Warren brought this lawsuit.[3]

_____

[1] Defined as "[a]ny nonprofit organization which has an office in Fairfax County and/or serves the citizens of Fairfax County ...." Fairfax County Procedural Memorandum No. 08-05 at 4 (Nov. 18, 1996).

[2] Until 10 years ago, the Fairfax County seat of government was located in Fairfax City.

[3] Although at oral argument Warren cited to the Privileges and Immunities clause, U.S. Const. art. IV, § 2, cl. 1, she did not base her claim on the Privileges and Immunities clause. Nor could she have done so since she is a citizen of Virginia. See United Building and Construction Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden, 465 U.S. 208, 217 (1984). A citizen from another state could bring a Privileges and Immunities clause challenge against the Memorandum, however. See id. at 215-18. I make no comment as to the validity of such a claim.

10

II.

The Supreme Court recently confirmed that courts should evaluate First Amendment rights on government-owned property under a public forum analysis. See Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. ___, ___, 118 S. Ct. 1633, 1641 (1998). The public forum analysis was created to recognize that the government must be able to limit the use of its property to the intended purpose for which the property was created, see, e.g., Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 800 (1985); Adderley v. Florida, 385 U.S. 39, 48 (1966), and to limit access to those rightfully conducting business there, see, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 53 (1983). Toward that end, the Court has identified at least three types of fora for First Amendment purposes, each subject to a different regime of constitutional scrutiny: the traditional public forum, the designated public forum, and the nonpublic forum. Ark. Educ., 523 U.S. at #6D 6D6D#, 118 S. Ct. at 1641 (quoting Cornelius, 473 U.S. at 802). The Court distinguishes between these fora based upon the physical characteristics of the property, including its location, see, e.g., Frisby v. Schultz, 487 U.S. 474, 480-481 (1988); United States v. Grace, 461 U.S. 171, 177, 179 (1983); the objective[4] use and purposes of the property, see, e.g., Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641; Cornelius, 473 U.S. at 800, 805, 809; and government intent and policy with respect to the property, which may be evidenced by its historic and traditional treatment, see, e.g., Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680-681 (1992). None of these factors is dispositive. See United States v. Kokinda, 497 U.S. 720, 727 (1990) (plurality opinion) (physical characteristics of property not dispositive); Grace, 461 U.S. at 177 (fact that property is subject to use by general public is not dispositive); Lee v. Int'l Society for Krishna Consciousness, Inc., 505 U.S. 830 (1992) (government policy prohibiting distribution of literature on

_____

[4] The term "objective" in this context means, "without reference to the attempted restriction on speech". The restriction on speech cannot be used to justify itself, but must be justified by reference to some non-speech-restrictive aspect of the forum. See, e.g., Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 691 (1992) (O'Connor, J., concurring in ISKCON v. Lee and concurring in the judgment in Lee v. ISKCON, 505 U.S. 830 (1992)).

11

property struck down); Cornelius, 473 U.S. at 805 (government's decision to limit access is not itself dispositive).

Traditional public fora have objective characteristics which "require the government to accommodate private speakers." Ark Educ., 523 U.S. at ___, 118 S. Ct. at 1641. See also ISKCON v. Lee, 505 U.S. at 686 (O'Connor, J., concurring in ISKCON v. Lee and concurring in the judgment in Lee v. ISKCON) (Public access to traditional public fora is "`inherent in the open nature of the locations'") (quoting Kokinda, 497 U.S. at 743 (Brennan, J., dissenting)). The typical traditional public forum is property which has the physical characteristics of a public thoroughfare, see, e.g., Kokinda, 497 U.S. at 727 (plurality opinion), which has the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, see, e.g., Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641, and which by history and tradition has been used for expressive conduct, see, e.g., Perry, 460 U.S. at 45. The archetypical examples of traditional public fora are streets, sidewalks, and parks:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

Hague v. C.I.O., 307 U.S. 496, 515-16 (1939). See also Grace, 461 U.S. at 177. Since it is so likely that any given street, sidewalk, or park meets all three characteristics of a traditional public forum a court can generally treat a street, sidewalk, or park as a traditional public forum without making a "particularized inquiry". See Frisby v. Schultz, 478 U.S. at 481; Grace, 461 U.S. at 179-180; ISKCON v. Lee, 505 U.S. at 697 (Kennedy, J., concurring in the judgments in ISKCON v. Lee and Lee v. ISKCON). Occasionally, further inquiry may be necessary even when property has the physical characteristics of a traditional public forum and is generally open to public traffic. For instance, neither a sidewalk on a military base over which the military has retained control, compare Greer v. Spock, 424 U.S. 828 (1976), with Flower v. United States, 407 U.S. 197 (1972) (per

12

curiam), <u>cited with approval in Greer</u>, 424 U.S. at 835, nor a single-purpose sidewalk physically separated from the rest of municipal sidewalks and part of a class historically subject to restrictions, <u>see</u> <u>Kokinda</u>, 497 U.S. 720 (plurality opinion),**5** are traditional public fora.

The Supreme Court has recently stated that traditional public forum status does not "extend[ ] beyond its historic confines ...." <u>Ark. Educ.</u>, 523 U.S. at ___, 118 S. Ct. at 1641. The Court has never precisely stated what those confines are, however. For instance, the Court has never defined the terms "street," "sidewalk," or "park." Nor has the Court strictly limited the traditional public forum category to streets, sidewalks, and parks. <u>See Southeastern Promotions, Ltd. v. Conrad</u>, 420 U.S. 546 (1975) (leased municipal theater is a public forum); <u>Heffron v. Int'l Society for Krishna Consciousness, Inc.</u>, 452 U.S. 640 (1981) (state fair is a public forum); <u>Edwards v. South Carolina</u>, 372 U.S. 229 (1963) (grounds of state capitol are a traditional public forum).

Access to traditional public fora may be limited only by content-neutral and "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions ...`are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989) (quoting <u>Clark v. Community for Creative Nonviolence</u>, 468 U.S. 288, 293 (1984)). Exclusion on the basis of speaker-identity is valid only where the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. <u>Ark. Educ.</u>, 523 U.S. at ___, 118 S. Ct. at 1641 (quoting <u>Cornelius</u>, 473 U.S. at 800).

The second category is the nonpublic forum. Some Supreme Court precedent indicates that all government properties which are not traditional public fora and which the government has not intentionally opened to expressive conduct are nonpublic fora. <u>See ISKCON v. Lee</u>,

_____

**5** It is notable, though, that five Justices evaluated the restriction at issue in <u>Kokinda</u> under the traditional public forum standard. <u>See</u> <u>Kokinda</u>, 497 U.S. at 737 (Kennedy, J., concurring in the judgment); <u>id.</u> at 740 (Brennan, J., dissenting, joined by Marshall, Stevens, and, in part, Blackmun).

13

505 U.S. at 680. But see Kokinda, 497 U.S. at 738-39 (Kennedy, J., concurring in the judgment) (objective characteristics and customary use by the public may control forum designation over government intent). Accord ISKCON v. Lee, 505 U.S. at 693 (Kennedy, J., concurring in the judgments in ISKCON v. Lee and Lee v. ISKCON). Covering such a wide variety of property, it is difficult to narrow the exact physical characteristics,[6] objective uses and purposes, and government intent that must characterize nonpublic fora. One characteristic has been assumed in all of the Supreme Court cases that address the issue, however: opening the nonpublic forum to expressive conduct will somehow interfere with the objective use and purpose to which the property has been dedicated.[7] See, e.g., Ark. Educ., 523 U.S. at ___, ___, 118 S. Ct. at 1641, 1643; ISKCON v. Lee, 505 U.S. at 681; id. at 699 (Kennedy, J., concurring in the judgments in ISKCON v. Lee and Lee v. ISKCON); Kokinda, 497 U.S. at 728-29, 733 (plurality opinion) (designation as nonpublic forum depends, in part, on purpose of property; solicitation disrupts purpose); Cornelius, 473 U.S. at 800; United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 130 n.6 (1981); Greer v. Spock, 424 U.S. at 838; Adderley v. Florida, 385 U.S. at 47-48. The Supreme Court has addressed this characteristic in evaluating the types of speech restrictions that are permissible in nonpublic fora. Restrictions on speech in nonpublic fora must be viewpoint neutral and reasonable "in light of the purpose of the forum and all the surrounding circumstances". Cornelius, 473 at 809. Therefore, restrictions on speech in public fora are justified to the extent that the speech at issue would interfere with the objective purposes and use of the forum. See , e.g., ISKCON v. Lee, 505 U.S. at 688, 692 (O'Connor, J., concurring in ISKCON v. Lee and concurring in the judgment in Lee v. ISKCON) (quoting Perry, 460 U.S. at 50-51, itself quoting U.S.P.S. v. Greenburgh, 453 U.S. at 129-130) (reasonableness justified by "lawfully dedicated"

_____

[6] A forum need not have a physicalexistence. See, e.g., Ark. Educ., 523 U.S. ___, 118 S. Ct. 1633 (public access debate); Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819 (1995) (student activities fund).

[7] There are actually two assumptions here: First, that the property has been dedicated to some objective use or purpose (i.e., a use or purpose independent of any speech restrictions); and second, that the objective use or purpose is somehow inconsistent with free and open speech.

intended use of the property). See also Multimedia Pub. Co. v. Greenville-Spartanburg Airport District, 991 F.2d 154, 159 (4th Cir. 1993) ("the overall assessment [as to reasonableness] must be undertaken with an eye to the `intended purposes,' of [the property] and of the ways in which the regulated conduct ... might actually interfere with the carrying out of those purposes.").

The final category is actually a hybrid of the other two. So-called "designated public fora" (often called "limited public fora") are those properties which the government has opened for expressive activity to the public, or some segment of the public. Ark. Educ., 523 U.S. at ___. A designated public forum can be opened only to a limited class of speakers or for limited topics. Perry, 460 U.S. at 46 n.7. Merely allowing some speech on property that is not a traditional public forum does not automatically create a designated public forum. The Supreme Court recently clarified the distinction. The government creates a designated public forum when it purposefully makes property "generally available" to a class of speakers. See Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1642 (quoting Widmar v. Vincent, 454 U.S. 263, 264 (1981)). By contrast, the government may retain nonpublic forum status by allowing selective, permission-only access to the forum. See id. The granting of such permission must be contingent upon non-ministerial judgments. See id.; Cornelius, 473 U.S. at 804.

Two levels of First Amendment analysis are applicable to limited public fora. First, is the "internal standard" -- "[i]f the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available, its action is subject to strict scrutiny." Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641. That is, as regards the class for which the forum has been designated, a limited public forum is treated as a traditional public forum. So, for instance, a University may not exclude certain student speakers from meeting space or university funding otherwise available on a generalized basis to students and student groups. See Widmar, 454 U.S. 263. Cf. Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819 (1995) (exclusion was viewpoint-based).

The second standard, the "external standard", places restrictions on the government's ability to designate the class for whose especial benefit the forum has been opened. The Supreme Court has not yet

15

clearly stated what these external limitations are, except to say that once a limited forum has been created, entities of a"similar character" to those allowed access may not be excluded. <u>Perry</u>, 460 U.S. at 48. <u>Cf. also id.</u> at 55 ("the state may draw distinctions which relate to the special purpose for which the property is used"); <u>Ark. Educ.</u>, 523 U.S. at ___, 118 S. Ct. at 1647 (Stevens, J., dissenting) ("the First Amendment will not tolerate arbitrary definitions of the scope of the forum."); <u>Cornelius</u>, 473 U.S. at 825-27 (Blackmun, J., dissenting) (discussing limits, if any, placed on government's ability to define the scope of a limited public forum). Initially, since designated public fora, in the absence of an affirmative governmental designation, would be treated as nonpublic fora, it would seem logical that the selection of the class would be subject only to the standards applicable to restrictions on speakers in a nonpublic forum. That is, the selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum.**8** <u>See ante</u> at 7.

III.

A.

The Center Island mall is a traditional public forum. The Center Island mall has the physical characteristics of a public thoroughfare like a park or a mall; it has the objective use and purposes of open public access and its use is eminently compatible with expressive activity; and it is part of a class of property which by history and tradition has been open and used for expressive activity.

The Center Island mall has the physical characteristics of a public thoroughfare like a park or a mall. The district court and the majority disagree. They describe the Center Island mall as merely a landscaped "median dividing a u-shaped driveway" and they argue that land-

_____

**8** As Justice Blackmun has pointed out, <u>see Cornelius</u>, 473 U.S. at 825-27, this in effect makes the limited public forum analytically indistinct from a nonpublic forum. If it is reasonable (or unreasonable) to exclude a speaker from a nonpublic forum, then it must also be reasonable (or unreasonable) to exclude the speaker from the class of speakers to which the forum has been opened on a limited basis.

16

scaped medians are not traditional public fora. Both contentions are wrong.

The Center Island mall is not merely a landscaped median strip. We have not been given the exact dimensions of the Center Island mall, but the aerial photos indicate that it is at least 30 yards wide and approximately two hundred yards long (i.e., it has more square footage than a football field), divided into three sections of roughly equal size by street intersections. Sidewalks circumnavigate the mall and traverse a center landscaped area, inviting pedestrians to stroll along the mall and explore the landscaping further. The section of the mall closest to the Government Center features a circular landscaped area with additional walkways. A "mall" is defined as "a usu[ally] public area (typically a lane or similar strip) often set with trees or bushes or flowers and designed as a promenade for leisurely strolling or as a pedestrian walk." Webster's Third New International Dictionary 1367 (unabr. 1993). A park is "a tract of land maintained by a city or town as a place of beauty or of public recreation." Id. at 1642. The Center Island mall fits neatly into these definitions.

The majority tries to avoid these common sense designations of the Center Island mall by focusing on the fact that the Center Island mall is surrounded by a "driveway". The fact that the Center Island mall is surrounded by streets or a "driveway" does not suggest that it is not a public forum. Municipal parks and malls are always surrounded by streets. Because of limited space in municipalities, parks and malls must be squeezed between streets, serving both as destinations for park-type activities and as traffic control mechanisms. See, e.g., Flamer v. City of White Plains, New York, 841 F. Supp. 1365, 1368 (S.D.N.Y. 1993) (noting that municipal park was merely a median between two streets, only 15 feet wide at its narrowest end). Under the majority's approach, one could argue that the National Mall is merely a median dividing Independence Avenue from Constitution Avenue, or, more to scale, that the Mount Vernon park in Baltimore, housing the nation's first Washington monument, is merely a median dividing traffic on Charles Street.

In fact, that the Center Island mall is an open area surrounded by a "U-shaped driveway" lying directly in front of a seat of government provides support for the idea that the Center Island mall is a tradi-

17

tional public forum. The physical characteristics of the Center Island mall are strikingly similar to the government center grounds in Edwards v. South Carolina, 372 U.S. 229. There the Supreme Court described the grounds on and around which the protesters were marching as the "horseshoe," a fairly large open area, surrounded by sidewalks. Edwards, 372 U.S. at 230. The"horseshoe" received its name because it was defined by a U-shaped driveway. See id. at 230-32, 240 & n.3 (majority opinion and Clark, J., dissenting). The Supreme Court had no trouble treating the horseshoe-- an open area surrounded by a U-shaped driveway -- as a traditional public forum. See id. at 235-236. I would follow the Supreme Court's lead.

The Center Island mall has the objective use and purpose of open access to the general public, which is eminently compatible with the widest scope of expressive activity. The majority argues that areas like the Center Island mall do not have the objective purpose and use to promote expressive activity because they are"designed primarily for aesthetic purposes such as plantings". Ante, at 6. This is irrelevant, however; the fact that the Center Island mall may have been designed primarily for "aesthetic purposes, such as plantings" does not provide support for the majority's position. First, the primary purpose for which a particular piece of property was created is not dispositive. One cannot seriously argue with Justice Kennedy's observation that the traditional public fora of streets, sidewalks, and parks are not primarily designed for expressive purposes. See ISKCON v. Lee, 505 U.S. at 696-97 (Kennedy, J., concurring in the judgments in ISKCON v. Lee and Lee v. ISKCON). Sidewalks are designed for safer and more convenient walking; the Supreme Court has noted that "the primary purpose to which the streets are dedicated" is "the movement of people and property." Schneider v. State of New Jersey, 308 U.S. 147, 160 (1939). As the definitions quoted above indicate, and any stroll will confirm, parks and malls are often designed merely for aesthetic purposes, including plantings. The test is not whether the property was designed for expressive activity, but whether the objective uses and purposes of the property are compatible with the wide measure of expressive conduct characterizing public fora. See Grayned v. City of Rockford, 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."). There is no doubt that the objective use and purpose of the Center Island mall

18

is compatible with expressive activity. The Center Island is an outdoor, non-enclosed area, open to the public. The County has admitted that speech is compatible with the Center Island mall by "encouraging" qualified persons (who number close to one million people) to use it for all manner of expressive activity. The district court agreed with the County's assessment:

> Because it is close to the seat of government and yet far enough away that activity there would cause no disruption, it is a particularly apt location in which to engage in political or otherwise protected speech.

988 F. Supp. 957, 963. In fact, up until November 1996, access to the Center Island was apparently open to all speakers via a licensing procedure. Ms. Warren was actually allowed to mount a Christmas display on the grounds of the Government Center Complex in 1995.

Finally, the Center Island is part of a class of property which, by history and tradition, has been treated as a public forum. It is a part of the grounds of a seat of legislative and executive power. "In general, the grounds ... of state and federal capitol complexes ... have consistently been held to be public fora." ACT-UP v. Walp, 755 F. Supp. 1281, 1287 (M.D. Pa. 1991) (citing, inter alia, Grace, 461 U.S. 171). See also Edwards, 372 U.S. 229; Adderley v. Florida, 385 U.S. at 41 (distinguishing Edwards by stating,"[t]raditionally, state capitol grounds are open to the public. Jails ... are not."); Women Strike for Peace v. Morton, 472 F.2d 1273, 1287 (D.C. Cir. 1972) (Wright, J., concurring) ("Parks are much more like state capitol grounds .... [they] have long been regarded as `a particular kind of community area that, under the Anglo-American tradition, are available, at least to some extent and on a reasonable basis, for groups of citizens concerned with the expression of ideas.'") (quoting Women Strike for Peace v. Hickel, 420 F.2d 597, 600 (1969)).

Thus, we are faced with a park or a mall, strikingly similar to property already determined by the Supreme Court to be a traditional public forum, which is open to the public, which is suitable and actually used for expressive activity, and which, lying directly in front of a seat of government power, is part of a class of property traditionally

19

open to expressive activity. I cannot fathom how the majority maintains that the Center Island mall is not a public forum.

B.

Even if I was to agree with the majority that the Center Island mall is only a landscaped median strip, I would disagree with the majority's conclusion that median strips are not traditional public fora.[9] Neither the district court nor the majority cited to any authority supporting their novel attempt to carve out an exception from the public forum doctrine for property that, quite literally, lies at the heart of the Supreme Court's quintessential example of the traditional public forum. If streets, sidewalks and parks are traditional public fora, then a court bears a heavy burden in explaining why property which is merely a combination of all three from the standpoint of physical characteristics, objective uses and purposes, and traditional and historic treatment, is not. Median strips, like sidewalks, are integral parts of the public thoroughfares that constitute the traditional public fora.[10] In many cases, median strips house sidewalks.[11] If a person who is rightfully on a street or sidewalk left open to the public "carries with him there as elsewhere the constitutional right to express his views in an orderly fashion," Jamison v. Texas, 318 U.S. 413, 416 (1943), I do

_____

[9] I note that I am not referring to median strips on interstates and similarly cordoned off expressways, which by their nature are not generally accessible to pedestrians. The Center Island mall is not such a median strip, as evidenced by the sidewalks around its circumference. For a discussion of the great variety of median strip shapes, sizes, and characteristics, see ACORN v. City of New Orleans, 606 F. Supp. 16, 19 n.6, and 22-24 (E.D. La. 1984).

[10] Many jurisdictions even include median strips and sidewalks in their definition of the term "street". See, e.g., Central American Refugee Center-Carecen (N.Y.) v. City of Glen Cove, 753 F. Supp. 437, 443 (E.D.N.Y. 1990); ISKCON of New Orleans, Inc. v. City of Baton Rouge, 668 F. Supp. 527, 530 n.3 (M.D. La. 1987), aff'd 876 F.2d 494 (5th Cir. 1989).

[11] The majority's approach would force courts in the future to try and distinguish when a sidewalk is a public forum because it is a sidewalk and when a sidewalk is a nonpublic forum because it is actually a median strip.

20

not see how the person loses that right merely by stepping onto the median. Nor does the general public. Consistent with the median strip's function as part of the public thoroughfares traditionally open to the public for expressive activities, people have been engaging in such activity on median strips for as long as median strips have been in existence. Newspaper criers, local civic fundraisers, members of political campaigns, religious groups, and people with a message have often chosen median strips, with their ready access to the bustle of undifferentiated humanity, as their preferred launching point for expressive conduct.

In fact, given that streets and sidewalks are the prototypical examples of traditional public fora, I am perplexed at the majority's conclusory, one-sentence dismissal of the idea that medians are not part of these traditional public fora. Especially so, since every other court that has addressed the matter has treated medians for First Amendment purposes as part and parcel of the streets and sidewalks of which they form an integral part, including the Ninth Circuit, the Sixth Circuit, the Fifth Circuit, the Eighth Circuit, and a court in the Eleventh Circuit. See Sloman v. Tadlock, 21 F.3d 1462, 1465, 1469 (9th Cir. 1994); ACORN v. City of Phoenix, 798 F.2d 1260, 1267 (9th Cir. 1986); Ater v. Armstrong, 961 F.2d 1224, 1225, 1227 (6th Cir. 1992); Int'l Society for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge, 876 F.2d 494, 497 (5th Cir. 1989); ACORN v. City of New Orleans, 606 F. Supp. 16, 19-20 (E.D. La. 1984); Ass'n of Community Organizations for Reform Now v. St. Louis County, 930 F.2d 591, 593, 594 (8th Cir. 1991); News & Sentinel Co. v. Cox, 702 F. Supp. 891, 899 (S.D. Fla. 1988). The majority does not cite to even one of these cases. In each of these cases, restrictions that affected an individual's use of medians for expressive purposes were analyzed under the traditional public forum analysis.**12**

_____

**12** Several of these courts reserved the question of whether streets that have been opened to traffic still constitute traditional public fora. See, e.g., ACORN v. City of Phoenix, 798 F.2d at 1267; News & Sentinel Co. v. Cox, 702 F. Supp. at 899 n.21. Even if streets opened to traffic are not traditional public fora, this would not necessarily indicate that median strips, especially those housing sidewalks, also lose their traditional public fora status.

21

C.

Therefore, no matter whether the Center Island mall is a park or a mall or a landscaped median strip, it is still a traditional public forum. Content-neutral regulation of speech in the Center Island mall is thus limited to "reasonable restrictions on the time, place, or manner ... provided the restrictions ... `are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. at 791 (quoting Clark v. Community for Creative Nonviolence, 468 U.S. at 293). The County cannot exclude a speaker from the Center Island unless "`the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" Ark. Educ. , 523 U.S. at ___, 118 S. Ct. at 1641 (quoting Cornelius, 473 U.S. at 800). The County's exclusion of non-residents must fall before these tests.

The County's exclusion of non-residents is not a reasonable time, place, or manner restriction. Recognizing the important traffic and safety concerns at issue, several courts have upheld limits or even bans on certain speech in areas in close proximity to streets with moving traffic, including median strips, as reasonable time, place, or manner restrictions. See, e.g., ACORN v. City of Phoenix, 798 F.2d at 1267; ISKCON of New Orleans, Inc. v. City of Baton Rouge, 876 F.2d at 497. The County has not asserted any traffic or safety need to shut down the Center Island mall to expressive conduct by non-residents. Nor could the County make such a claim -- its avowed goal is to encourage qualified persons to use the Center Island mall for expressive conduct. Therefore, the residency restriction is unreasonable as a time, place, and manner restriction.

Nor is the County's exclusion of non-resident speakers narrowly tailored to achieve compelling state interests. The County has asserted numerous interests served by its residents-only policy: (1) it reduces the County's maintenance, upkeep, and wear-and-tear costs, because, inter alia, it reduces the amount of resources the County must devote to ensure compliance with the other terms of the Memorandum; (2) it ensures the availability of the Center Island mall for use by residents; (3) it is an efficient way to allocate limited resources; (4) it reduces the clutter that might accrue on the Center Island mall by lim-

22

iting the number of potential users who may set up a display; (5) it provides a benefit to County residents whose tax dollars built and maintain the Complex; and (6) it avoids the creation of an indiscriminately opened public forum. Assuming that at least some of these interests are compelling,**13** the residents-only policy must be struck down because it is not narrowly tailored to achieve any of these ends. While narrow tailoring under the time, place, and manner standard does not require use of the least-restrictive alternative, Ward, 491 U.S. at 797, the County may not burden substantially more speech than is necessary to further its interests, id. at 799. Here, the County's policy burdens substantially more speech than necessary to further any of its asserted interests. The County has closed this public forum to the entire world of speakers except the class of qualified persons. The same interests could be achieved with much less burden by the simple expedients of charging fees for upkeep and monitoring costs, or by creating a priority system favoring qualified persons.

Further, the record shows that, in fact, the County's policy is wholly unnecessary as concerns the Center Island mall. Since November 1996, only eight applications have been received for private displays in the Center Island mall; six of these have been from Ms. Warren or one of her supporters. The Center Island mall is large enough to accommodate numerous displays at the same time. Since we are not using a rational basis analysis we need not credit theoretical arguments raised by the County. Certainly the demand for use of the Center Island mall has not necessitated the County's residents-only policy. I would therefore strike down the residents-only policy on First Amendment grounds as applied to the Center Island mall.

IV.

Even were I to ignore all of the relevant criteria and courts from five other circuits, and agree that the Center Island mall is only a limited public forum, I would hold that the County's effort to restrict access based upon residency is unreasonable in light of the objective purpose served by the Center Island mall.

_____

**13** Undoubtedly, it cannot be a compelling state interest to treat a public forum as a nonpublic forum.

It is clear that the County has designated the Center Island mall to be a limited public forum. The decisive difference between a limited public forum and a nonpublic forum recently delineated by the Supreme Court is whether access to the forum is available on a general or a selective basis. Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1642. Here, the County encourages any member of the limited class of qualified persons to use the Center Island mall for expressive purposes and nothing in the record indicates that the County makes any "non-ministerial judgments", see id., selecting which of the many members of the class who desire to may actually use the forum. This is general access sufficient to designate a public forum.

As I have noted, supra, in section II, the Supreme Court has yet to address specifically the "external standard"-- the limits on a government entity's ability to designate a class. I have assumed that the designation of the class must only be viewpoint-neutral and reasonable in light of the objective purposes of the forum. I agree with the majority that the residency-restriction is viewpoint neutral. I do not agree, however, that it is reasonable in light of the objective purposes of the forum.

The reasonableness required in the nonpublic forum setting is not merely a rational basis standard. "[I]t is not enough simply to establish that the regulation is rationally related to a legitimate governmental objective ... for this regulation affects protected First Amendment activity that is entitled to special solicitude even in [a] nonpublic forum." Multimedia Pub. Co., 991 F.2d at 159. Therefore, while a restriction need not be "the most reasonable or the only reasonable limitation", Cornelius, 473 U.S. at 808, the Court has required "some explanation as to why certain speech is inconsistent with the intended uses of the forum." ISKCON v. Lee, 505 U.S. at 692 (O'Connor, J., concurring in ISKCON v. Lee and concurring in the judgment in Lee v. ISKCON). The County has not shown that speech by non-residents is inconsistent with the objective use and purpose of the Center Island mall.

The majority asserts that the restrictions here would be justified because (1) the Government Center Complex was built with, and is maintained by, County funds provided by County taxpayers; (2) the County reasonably concluded that it will save money in maintenance

24

and supervision expenses if it limits access to some small class; and (3) the Center Island mall is adjacent to the County seat so it is reasonable to open it only to County residents and those who serve the County. These objective aspects of the Center Island mall do not indicate that its use should be limited to qualified persons. Given that the property at issue is an open, sidewalk-encircled mall, across from a seat of government, a restriction on residency is patently unreasonable.

The fact that the County built and maintains the Center Island mall with County funds does not provide a reasonable basis to prohibit non-residents from engaging in expressive activity on it. The County funds were not spent on building an edifice which serves exclusively local needs, such as a school or a local senior center. The Center Island mall lies directly in front of the center of County government. The County government center is the place where the County transacts its internal business, but it is also the place where outsiders have been invited to come to transact business with the County. Nor is the Center Island mall some enclosed space within the government center complex; it is an open mall. All of these "outsiders" presumably are welcome to freely traverse the Center Island mall on their way into and out of the government center, perhaps even to loiter there and talk about the business they have conducted. Thus, the objective uses of the surrounding property and the Center Island mall itself are not in any way inconsistent with speech by non-residents.

The County cannot reasonably argue that it is saving money on maintenance and supervision costs by restricting access to the Center Island mall to the limited group of qualified persons. First, the group that it has opened the Center Island mall to is, in whole numbers, huge. There are approximately 900,000 County residents alone. It is not reasonable to assert cost savings via rationing when the ration has been extended to about 900,000 people who are, by the simple fact of proximity, likely to be the most frequent users of the forum. This is not rationing, it is rationalization. Second, the County presented nothing but theoretical arguments that costs imposed by allowing non-residents access to the Center Island mall would be anything but de minimis. The record shows that, in fact, allowing non-residents to access the Center Island mall would impose only de minimis costs on the County. The Center Island mall is an outdoor, unenclosed area.

25

The County would not need to provide heat, water, electricity, security, or any personnel to accommodate any non-resident's use of the Center Island mall. The very limited demand for the Center Island further minimizes any clean-up costs the County might incur. Also, the County could easily impose a fee for any use which might require clean up costs. While the County need not select the most reasonable restrictions, "its failure to select this simple, available alternative suggests something about both the veracity of its asserted justification and the reasonableness of its blanket ban." Multimedia Pub. Co., 991 F.2d at 161.

Finally, the fact that the Center Island serves as the mall leading to the seat of government does not justify the County in limiting access exclusively to residents. In fact, I would reach just the opposite conclusion: precisely because the Center Island mall lies directly in front of the center of government, it is unreasonable to limit access to it on the basis of speaker identity once it has been opened. As the district court noted, the location of the Center Island mall makes it the ideal place for all individuals to engage in political or otherwise protected speech. 988 F. Supp. at 963. "There is an unmistakable symbolic significance in demonstrating close to the[center of government] ... which, while not easily quantifiable, is of undoubted importance in the constitutional balance." Women Strike for Peace, 472 F.2d at 1287 (Wright, J., concurring). In general, County residents would probably have an interest in using the grounds of the County seat for expressive activity more frequently than outsiders.[14] But, it would be unreasonably parochial for the County to think that its decisions are of no interest to and have no impact upon those in surrounding jurisdictions.

It is therefore unreasonable, in my view, to limit any sub-group's ability to express themselves on an outdoor, otherwise public area, well-suited for First Amendment activity, and directly in front of the most public of government properties. In short, we often refer to distinctions without differences. There are no practical distinctions

_____

[14] This would be self-regulating, however. So, it would be unreasonable to reserve an area for the exclusive use of County residents when non-residents would be less-interested in using the forum than residents, in any event.

26

between the Center Island as a public forum for County residents and such a use by residents of areas that surround the County.

27